UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| RICHARD A. KEMP, JR. and GWENDOLYN HENDERSON, individually and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ANTHONY F. SERRA, an individual, SERRA NISSAN/OLDSMOBILE, INC., an Alabama corporation, and SERRA VOLKSWAGEN, INC., an Alabama corporation,<br><br>Defendants. | Case No.:_____<br><br>**CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, RICHARD A. KEMP, JR. and GWENDOLYN HENDERSON, individually and on behalf of all those similarly situated, allege:

### INTRODUCTION

1. This lawsuit revolves around the predatory practices of automobile dealerships targeting lower-income borrowers and taking advantage of those without meaningful access to credit. These consumers thought they were paying for a vehicle, but were unaware they were actually paying to increase the dealerships' profit margins through unlawful markups, unwanted add-ons, and fraudulently inflated sales prices.

### NATURE OF THE CASE

2. This class action is brought under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961, *et seq.*) ("RICO") on behalf of Plaintiffs and putative class members (collectively "Plaintiffs," "Class," or "Class Members") that were injured by the predatory practices of Defendants Anthony F. Serra ("Tony Serra"), Serra Nissan/Oldsmobile, Inc. ("Serra Nissan"), and Serra Volkswagen, Inc. ("Serra VW") (collectively "Defendants") to fraudulently increase loan approvals, vehicle sales, and maximize profits for themselves.

3. The criminal indictments and plea agreements related to the fraudulent scheme

1

alleged in this Complaint are well-documented:

      a.     In September 2013, Abdul Islam Mughal, a former general sales manager at Serra Nissan, was arrested (and later indicted on charges of conspiracy and bank fraud), and Defendants publicly "stress[ed] that the actions of a single individual are no reflection on the company's other loyal employees";[1]

      b.     On August 27, 2014, Gerald R. Shepard, another former general sales manager at Serra Nissan, was indicted on charges of conspiracy and bank fraud, and Defendants claimed, "[T]hese allegations, while disappointing, should not be viewed as a reflection of our company or as a reflection of all of our employees who have always conducted themselves with honesty and honor";[2]

      c.     On September 26, 2014, five more employees were indicted—two managers and three salesmen—on charges of conspiracy, bank fraud, wire fraud, and identity theft, and Defendants responded, "The actions of a few former employees should not be viewed as a reflection of our company or our many employees who conduct business with complete integrity";[3] and

      d.     On December 30, 2014, Jeffrey R. Green, a former finance manager at Serra Nissan, was charged with conspiracy and entered a plea agreement. When notified of the charges, Defendants suggested that Green was simply another "former employee[ ] . . . accused of failing to live up to the values that are the foundation of our longtime success" and that his actions "should not be viewed as a reflection of our company."[4]

---

[1] Kent Faulk, *Former sales manager at Serra Nissan in Birmingham indicted for falsifying customer loan documents*, AL.com (last updated Oct. 7, 2013, 5:16 PM), http://blog.al.com/spotnews/2013/10/former_sales_manager_at_serra.html.

[2] Kent Faulk, *Former Serra Nissan manager indicted in car loan fraud scheme; one other already charged*, AL.com (last updated Sept. 4, 2014, 3:08 PM), http://www.al.com/news/birmingham/index.ssf/2014/09/former_serra_nissan_manager_in.html.

[3] Kent Faulk, *Five former Serra Nissan employees arrested in federal probe*, AL.com (last updated Oct. 1, 2014, 6:44 PM), http://www.al.com/news/birmingham/index.ssf/2014/10/five_former_serra_nissan_emplo.html.

[4] Kent Faulk, *8th former Serra Nissan manager charged in federal fraud probe*, AL.com (last updated Dec. 30, 2014, 10:08 PM), http://www.al.com/news/birmingham/index.ssf/2014/12/8th_former_serra_nissan_manage.html.

4.      Yet, these were not the acts of a few "rogue" employees. Plaintiffs were victimized by the same predatory practices charged in the indictments by the concerted actions of a salesman at Serra Volkswagen, Inc., Andy Taylor, and a manager at Serra Nissan, Patrick Donlevy.

5.      The reason Defendants' predatory practices permeate their businesses is simple—as "the foundation of" their "longtime success," they established, directed, and financially incentivized their employees to accomplish them:

   a.    Employees and associates "were *financially incentivized to submit fraudulent documents and 'power book'* at Serra Nissan, because if a vehicle was sold, and the total profit on the transaction was high enough to qualify it as a 'drop deal,' Serra Nissan would pay . . . employees on the deal an additional amount *on top* of their normal commission";[5]

   b.    Employees and associates "were instructed by management, as a *policy and practice* at the dealership, to shred original credit applications filled out by certain customers so there was no record of the customer's actual income";[6] and

   c.    Employees and associates "falsely report[ed] that vehicles were sold at Serra Nissan, when, in fact, they were sold at a different dealership, in order to obtain incentive payments to which Serra Nissan was not entitled"[7] without the fraudulent representation.

6.      There was a pervasive scheme throughout Defendants' automobile dealerships, which was carried on at Defendants' direction, with their participation, or with their full knowledge, approval, and ratification, that if a prospective customer did not qualify for a vehicle

---

[5] Plea Agreement of Abdul Islam Mughal (attached as Exhibit A); Plea Agreement of Gerald R. Shepard (attached as Exhibit B) (emphasis added); *see also* Information of Jeffrey R. Green and Waiver of an Indictment (attached as Exhibit K) ("It was a further part of the conspiracy that defendant [Green], and others both known and unknown to the United States Attorney, were financially incentivized to increase the loan amount to increase commissions for certain employees.").
"Power booking" refers to the process of submitting "falsified information to financial institutions regarding what features were actually on the vehicle, i.e., power seats, sunroofs, towing packages, etc., in order to artificially inflate the vehicle's retail value, so that the financial institution would increase the amount funded for the car." (*E.g.*, Exs. A-B).
[6] Ex. K (emphasis added).
[7] *Id.*

3

loan, an employee or associate would falsify information and submit fraudulent documents to financial institutions to ensure the customer was funded; fraudulently inflate the value of a vehicle by listing accessories it did not actually include to increase loan amount; and among other things, "pack" the loan with the cost of add-on products—such as a vehicle service contract, warranty, or gap contract—without the customer's knowledge.

7. Defendants' predatory practices threaten not only consumer safety but also the nation's financial system. As noted by FBI Special Agent in Charge Richard D. Schwein Jr., "'This case is significant . . . not merely because of the loss amounts but also because of the many victims left in the wake of this scheme who had trusted the defendants with handling their vehicle financing.'"[8] "Predatory practices in providing auto loans to people with credit problems or insufficient income is akin to the fraud in mortgage lending," stated U.S. Attorney Joyce White Vance.[9] "This type of fraud is the auto-industry equivalent of the mortgage fraud that contributed to the financial meltdown, and could threaten the security of our financial markets."[10]

8. Defendants intended to and have benefited from the fraudulent scheme by, among other things, increasing the number of cars sold to buyers that otherwise would not have been approved for a loan, inflating the prices of vehicles, and packing loans to incorporate the cost of add-on products without the buyer's knowledge in order to maximize vehicle sales, profits, and commissions for themselves.

9. As noted by IRS Criminal Investigation Special Agent in Charge Veronica Hyman-Pillot, Defendants and their employees "clearly took advantage of the people in their community, as well as financial institutions. They manipulated the system and falsified

---

[8] FBI, Birmingham Division, *Two Serra Nissan Managers and Three Salesmen Charged in Loan Fraud Conspiracy*, FBI.gov (Oct. 1, 2014), http://www.fbi.gov/birmingham/press-releases/2014/two-serra-nissan-managers-and-three-salesmen-charged-in-loan-fraud-conspiracy.
[9] FBI, Birmingham Division, *Four Serra Nissan Employees Plead Guilty in Auto Loan Fraud Conspiracy*, FBI.gov (Mar. 11, 2015), http://www.fbi.gov/birmingham/press-releases/2015/four-serra-nissan-employees-plead-guilty-in-auto-loan-fraud-conspiracy.
[10] *Two Serra Nissan Managers and Three Salesmen Charged in Loan Fraud Conspiracy*, *supra* note 8.

documents with the intention of increasing profits at the expense of others."[11]  Defendants, however, received the greatest benefit; their profit margins and commissions continued to grow through unlawful markups, unwanted add-ons, and fraudulently inflated sales prices.

10. Pursuant to Rules 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following Class:

> **All individuals in the United States who received an automobile loan processed by Serra Nissan.**

Excluded from the Class are the following individuals and/or entities:

    a. Any and all federal, state, or local governments, including but not limited to their department, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

    b. Individuals, if any, who timely opt out of this proceeding using the correct protocol for opting out;

    c. Individuals, if any, who have previously settled or compromised claims(s) as identified herein for the Class; and

    d. Any currently sitting federal judge and/or person within the third degree of consanguinity to any federal judge.

11. This class action seeks to recover damages stemming from Defendants' fraudulent activities prohibited under RICO; compensation for unjust enrichment, fraud, civil conspiracy, and negligence; and declaratory and injunctive relief.

## JURISDICTION AND VENUE

12. Jurisdiction is conferred on this Court by 18 U.S.C. § 1964(a), (c) and 28 U.S.C. § 1331 as these matters arise under the laws of the United States of America.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the federal law claims that they form part of the same case or controversy under Article

---

[11] *Four Serra Nissan Employees Plead Guilty in Auto Loan Fraud Conspiracy*, *supra* note 9.

III of the United States Constitution.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims of Plaintiffs and Class Members occurred here, and is proper pursuant to 18 U.S.C. § 1965(a) because the Defendants transacted their affairs here. Defendants do substantial business in the State of Alabama and within this District, are registered to and are doing business within this State, and otherwise maintain requisite minimum contacts with this State and this District. Additionally, Defendants' principal places of business are in this District, and they receive substantial compensation and profits from their business in this District. Defendants are therefore subject to *in personam* jurisdiction in this District, and venue is proper because Defendants reside in this District.

## PARTIES

14. Plaintiff RICHARD A. KEMP, JR is, and was at all times relevant, an adult resident of Jefferson County, Alabama.

15. Plaintiff, GWENDOLYN HENDERSON is, and was at all times relevant, an adult resident of Jefferson County, Alabama.

16. Defendant, ANTHONY F. SERRA ("Tony Serra") is an individual over the age of nineteen and a resident of Jefferson County, Alabama.

17. Defendant SERRA NISSAN/OLDSMOBILE, INC. ("Serra Nissan") is a domestic corporation, organized and existing under the laws of Alabama, with its principal place of business at 1500 Center Point Pkwy, Birmingham, AL 35215, and its registered office address at 9709 Parkway East, Ste. D, Birmingham, AL 35215.

18. Defendant SERRA VOLKSWAGEN, INC. ("Serra VW") is a domestic corporation, organized and existing under the laws of Alabama, with its principal place of business at 1490 Center Point Pkwy, Birmingham, AL 35215, and its registered office address at 9709 Parkway East, Ste. D, Birmingham, AL 35215.

## FACTUAL ALLEGATIONS

19. Defendants and their co-conspirators, on their own and as part of a common

6

fraudulent scheme and conspiracy, defrauded customers and financial institutions by means of materially false and fraudulent pretenses, representations, promises, or omissions. Defendants implemented and executed the fraudulent scheme through mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), and identity fraud (18 U.S.C. §§ 1028 and 1028A).

I. **The Serra Enterprise**

20. The following persons constitute a group of individuals and entities associated in fact and referred to in this Complaint as the "Serra Enterprise":

    a. Serra Nissan/Oldsmobile, Inc.,
    b. Serra Volkswagen, Inc.,
    c. Anthony F. Serra,
    d. Abdul Islam Mughal,
    e. Gerald R. Shepard,
    f. D. Scott Burton,
    g. Michael J. Wilkerson,
    h. Jeffrey R. Green,
    i. Dwight A. Perry,
    j. Terry W. Henderson, Jr.,
    k. Roland W. Riley,
    l. Andy Taylor,
    m. Patrick Donlevy,
    n. A to Z Confidential Investigations, Inc.,
    o. Other unnamed vehicle dealerships, and
    p. Other unnamed officers, directors, salesmen, general managers, general sales managers, sales managers, finance managers, and/or outside consultants providing services for Serra Nissan, Serra VW, and/or other unnamed vehicle dealerships.

21. The Serra Enterprise is an "enterprise," as defined by 18 U.S.C. § 1961(4),

7

engaged in and whose activities affect interstate commerce. The Serra Enterprise engages in and its activities affect interstate and foreign commerce by, among other things, buying and receiving automobiles from multi-national companies that are transported across state lines, receiving funds from lending institutions by interstate wire transmission, and conducting fundamental aspects of its business through the U.S. mail, interstate commercial carrier, wire or other interstate electronic media.

22. Defendants and all other members of the Serra Enterprise are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). Plaintiffs and Class Members are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

23. Defendant Tony Serra is the President of Serra Nissan and Serra VW. He exercises a managerial role in the affairs of Serra Nissan, Serra VW, and Serra Automotive and therefore in the affairs of the Serra Enterprise.

24. Defendants Serra Nissan and Serra VW are engaged in the business of selling and servicing new and used automobiles. Despite a common officer, Defendants Serra Nissan Serra VW are each a separate and distinct Alabama corporation; each has a separate ongoing business with a separate customer base; and each is free to act independently and advance its own interests contrary to those of the other. Although Defendants Serra Nissan and Serra VW are affiliated, neither is a parent or subsidiary corporation of the other.

25. Defendants Serra Nissan, Serra VW, and Tony Serra are not the Serra Enterprise itself; rather, each is associated with the Serra Enterprise and a perpetrator of the racketeering activity alleged in this Complaint. Each participated in and controlled the affairs of the enterprise, as the Serra Enterprise's fraudulent scheme could not have been successful without Defendants' direction, participation in, or knowledge, approval, and ratification of the overt acts carried out in furtherance of the enterprise's fraudulent scheme.

26. The Serra Enterprise has an ascertainable structure and purpose beyond the scope and commission of the predicate acts and conspiracy to commit such acts. At all relevant times, each Defendant and member of the enterprise also engaged in the business of selling and

servicing new and used automobiles by lawful, non-fraudulent means to customers that qualified for a loan.

27. From at least August 2010 until at least October 2013, members of the Serra Enterprise, at the direction of Defendants, with their participation or with their knowledge, approval, and ratification, committed and conspired to commit a series of related fraudulent acts for the common or shared purpose of submitting false information and fraudulent documents to financial institutions to ensure a prospective customer would receive a loan if they did not otherwise qualify for a loan. The ultimate objective of the fraudulent scheme was to increase the number of cars sold by fraudulent means and to inflate the prices of vehicles in order to maximize Defendants' vehicle sales, profits, and commissions.

28. Additional wrongdoers listed in Paragraph 20 that are not named as Defendants include without limitation:

   a. Abdul Islam Mughal "worked at Serra Nissan and other Serra entities intermittently over the last 14 years, most recently as a General Sales Manager (GSM) at Serra Nissan. As the GSM at Serra Nissan during the relevant time period, Mughal supervised the sales process, including the front end customer sales interaction, and the back end financing conducted by finance managers. Mughal also dealt directly with customers on the front end of many transactions." (Ex. A).

   b. Gerald R. Shepard was a sales manager at Serra Nissan beginning in June 2009. "As the Sales Manager at Serra Nissan during the relevant time period, Shepard supervised the sales process, including the front end customer sales interaction, and the back end financing conducted by finance managers. Shepard also dealt directly with customers on the front end of many transactions." (Ex. B).

   c. D. Scott Burton "began working for Serra Nissan as a sales manager in July, 2012. . . . As a sales manager, Burton was responsible for selling cars to customers who came in to the dealership, and also assisted other salesmen with 'closing' their deals with customers." (Plea Agreement of D. Scott Burton, attached as Exhibit C).

      d.      Michael J. Wilkinson "worked on and off for Serra Nissan, most recently, as a finance manager until March 2013. . . . As one of the finance managers at Serra Nissan during the relevant time period, Wilkinson was responsible for the back-end financing process. That process included submitting information to financial institutions in order to secure car loan financing for prospective customers." (Plea Agreement of Michael J. Wilkinson, attached as Exhibit D).

      e.      Jeffrey R. Green "was a Finance Manager at Serra Nissan" and he "worked at Serra Nissan from September 1, 2011, until he was terminated in October 2013. As one of the Finance Managers at Serra Nissan during the relevant time period, Green was responsible for the back-end financing process. That process included submitting information to financial institutions in order to secure car loan financing for prospective customers." (Plea Agreement of Jeffrey R. Green, attached as Exhibit E).

      f.      Dwight A. Perry "worked for Serra Nissan twice during his sixteen years as a car salesman. Most recently, Perry worked as a salesman at Serra Nissan from 2010 until October 2013. . . . As a salesman, Perry was responsible for selling cars to customers who came in to the dealership, and he also contacted customers over the phone to invite them to come to the dealership to purchase a car." (Plea Agreement of Dwight A. Perry) (attached as Exhibit F).

      g.      Terry W. Henderson, Jr. "worked for Serra Nissan as a car salesman. . . . As a salesman, Henderson was responsible for selling cars to customers who came in to the dealership, and he also contacted customers over the phone to invite them to come to the dealership to purchase a car." (Plea Agreement of Terry W. Henderson, Jr., attached as Exhibit G).

      h.      Roland W. Riley "worked as a salesman at Serra Nissan" during the relevant time, and "[a]s a salesman, Riley was responsible for selling cars to customers who came in to the dealership, and he also contacted customers over the phone to invite them to come to the dealership to purchase a car." (Plea Agreement of Roland W. Riley, attached as Exhibit H).

      i.      Andy Taylor worked as a salesman at Serra VW during the relevant time. As a salesman at Serra VW, Taylor was responsible for selling cars to customers who came in to the dealership, and he also contacted customers over the phone to invite them to come to the dealership to purchase a car. Taylor was the salesman that sold Plaintiffs their Corolla.

      j.      Patrick Donlevy worked as either a sales manager or finance manager at Serra Nissan. As one of the managers at Serra Nissan during the relevant time period, Donlevy was responsible for assisting other salesmen with "closing" their deals with customers; supervising the sales process, including the front end customer sales interaction, and the back end financing conducted by finance managers; and having customers sign the closing paperwork, including the paperwork for the sale itself and the car loan financing. Donlevy assisted Taylor in selling Plaintiffs their Corolla.

      k.      A to Z Confidential Investigations, Inc. provides investigative services and has been hired by Defendants Serra Nissan, Serra VW, and/or Tony Serra to engage in a course of business dealing to further carry out and conceal the Serra Enterprise's fraudulent scheme by contacting Plaintiffs and Class Members for the purpose of negotiating, drafting, and securing a written release of Plaintiffs' legal rights against Defendants Serra Nissan, Serra VW, and/or Tony Serra through false pretenses, representations, promises, or omissions.

## II. The Vehicle Financing Process

29. Defendants sell new and used vehicles and often assist prospective buyers with obtaining car loans.

30. When a prospective buyer needs to obtain a car loan, the dealership collects their personal information, including social security number, credit score, pay stubs, home address, personal references, and other information required by financial institutions in-person or through the U.S. mail, commercial interstate carrier, wire or other interstate electronic media.

31. Before a financial institution provides financing, the dealership is required to verify a prospective buyer's personal information, including but not limited to:

      a.      a personal reference sheet,

  b.  a valid driver's license for the buyer and co-buyer,

  c.  proof of income for the buyer and co-buyer,

  d.  proof of residence for the buyer and co-buyer, and/or

  e.  proof of insurance.

32. A sales manager then enters the prospective buyer's information in a database that submits their information to multiple financial institutions. The financial institutions could then respond with a financing offer, if any, to the customer. A finance manager would provide the prospective buyer with closing paperwork, including the paperwork for the sale itself and the car loan financing.

33. When a loan is financed, the funds from the financial institution are transmitted by wire from the lending institution directly to the dealership, causing wire communications to be made across state lines. From these funds, the dealership, employees, and associates involved in the deal are paid their commission.

34. After the buyer signs the closing paperwork, the dealership is then required to send the funding required documents to the lending institution, including without limitation:

  a.  the original credit application;

  b.  the buyer's personal information, including the reference sheet, a valid driver's license and proof of income;

  c.  the original executed Retail Installment Sales Contract ("RISC");

  d.  a copy of the Retail Order, Buyer's Order or Bill of Sale;

  e.  a copy of the title application;

  f.  the gap contract forms; and

  g.  the Vehicle Service Contract (or other similar extended service contract).

35. The dealership then submits the funding required documents to the lending institution through the U.S. mail or commercial interstate carrier. Lending institutions will not accept the funding required documents by wire or other interstate electronic media.

## III. The Racketeering Scheme, Criminal Indictments, and Plea Agreements

36. From at least August 2010 and continuing until at least October 2013, members of the enterprise, at the direction of Defendants, with their participation, or with their full knowledge, approval, and ratification, fraudulently increased loan approvals and vehicle sales by creating or altering documents to inflate the income for prospective buyers; submitted fraudulent documents to financial institutions; listed accessories not actually included on a vehicle so a financial institution would increase its loan amount; increased the vehicle sales price without the customer's knowledge; presented "straw buyers" who could qualify for a loan to financial institutions when the actual buyer could not qualify; and quoted prospective buyers an inflated monthly payment so Defendants could add a Vehicle Service Contract and/or Gap Contract at the end of the transaction without the buyer's knowledge.

37. The acts and practices used by Defendants and members of the enterprise in furtherance of the fraudulent scheme include:

    a. **"Fluffing"** refers to the act of fraudulently inflating "the income information of prospective car purchasers submitted to financial institutions so customers that would otherwise not qualify for car loan funding, would show an artificially high income and would be able to obtain a loan." (*E.g.* Exs. A-B).

    b. **"Power Booking"** refers to the act of submitting "falsified information to financial institutions regarding what features were actually on the vehicle, i.e., power seats, sunroofs, towing packages, etc., in order to artificially inflate the vehicle's retail value, so that the financial institution would increase the amount funded for the car." (*Id.*).

    c. **"Drop Deal"** refers to a transaction where Defendants would pay their salesmen, finance managers, sales managers, or GSMs additional compensation on top of their normal commission because the total profit on the transaction was increased as a result of submitting fraudulent documents and "power booking." (*See id.*).

    d. **"Payment Packing"** refers to the act of quoting the customer an inaccurately high monthly payment that incorporates the cost of additional products—such as a

vehicle service contract, warranty, or gap contract—that have not been properly disclosed to the customer; the customer was not made aware that the difference between the true monthly payment and the inaccurately high monthly payment has been built into the deal.

  e. **"Straw Buyer"** refers to the act of "making it appear that an individual who qualified for the loan . . . purchased the vehicle when in truth and fact, the actual purchaser would not otherwise qualify because they had poor credit, insufficient income, no proof of residency, etc." (*Id.*).

  38. As a standard business practice of the Serra Enterprise, Defendants and members of the enterprise would retain control of the closing documents, exposing only the signature line and telling the buyer where to initial or sign—initial here, initial there; sign here, sign there. They would not provide the closing documents for buyers to review prior to or during their execution. Buyers were therefore denied any meaningful opportunity to read the closing documents and were prevented from reviewing or understanding the financing terms.

  39. Defendants intended to and have benefited from the fraudulent scheme by, among other things, increasing the number of cars sold to buyers that otherwise would not have been approved for a loan, inflating the prices of vehicles, and packing loans to incorporate the cost of add-on products without the buyer's knowledge in order to maximize vehicle sales, profits, and commissions for themselves

  40. Defendants' direction of, participation in, or knowledge, approval, and ratification of the fraudulent scheme is demonstrated by, among other things, the fact that Defendants *"financially incentivized"* members of the Serra Enterprise "to submit fraudulent documents and 'power book'" by paying the "employees on the deal an additional amount on top of their normal commission," (Exs. A-B); "as a *policy and practice*," instructed members of the enterprise "to shred original credit applications filled out by certain customers so there was no record of the customer's actual income"; and "falsely report[ed] that vehicles were sold at Serra Nissan, when, in fact, they were sold at a different dealership, in order to obtain incentive payments" that Defendants were not otherwise entitled without the misrepresentation. (Ex. K).

### A. Criminal Charges and Indictments Related to the Serra Enterprise

41. Eight members of the Serra Enterprise—Mughal, Burton, Shepard, Wilkerson, Green, Perry, Henderson, and Riley (collectively "Indicted Persons")—were indicted or consented to prosecution by information on charges of conspiracy (18 U.S.C. § 371), bank fraud (18 U.S.C. §§ 1344, 1349 and 2), wire fraud (18 U.S.C. §§ 1343, 1349, and 2), identity theft (18 U.S.C. §§ 1028A and 2), and/or aiding and abetting bank fraud, wire fraud, and/or identity theft in connection with the Serra Enterprise's fraudulent scheme. (Information of Abdul Islam Mughal and Waiver of an Indictment, attached as Exhibit I); (Indictment of Gerald R. Shepard, attached as Exhibit J); (Indictment of D. Scott Burton, Michael J. Wilkinson, Dwight A. Perry, Terry W. Henderson, Jr., and Roland W. Riley; Information of Jeffrey R. Green and Waiver of an Indictment, attached as Exhibit K).

### Facts Common to All Indictments

42. "As part of the car loan funding process, Serra Nissan collected personal information from prospective customers, including, but not limited to, customers' social security numbers, credit scores, monthly income, pay stubs, current home addresses, personal references, and other information required by financial institutions in order to fund car loans. Some of that information was gathered when the customer came in and spoke to a salesman, while more detailed information was collected at the final signing or financing, conducted by a finance manager. The entire process was overseen by the General Sales Manager ('GSM') or a sales manager." (Exs. I-K).

43. "When a customer initially provided information to a salesman, the salesman would enter that information into a software program used by Serra Nissan to store and track information on its customers. If a customer needed to obtain a car loan, the GSM or a sales manager would enter the customer's information into a different online database that submitted their information to multiple financial institutions simultaneously. The financial institutions could then respond with what financing, if any, they were willing to offer the customer. If a financial institution approved the transaction, the customer would be sent to the financing

department to negotiate their loan price. There, they would meet with a finance manager who would provide them with their closing paperwork, including the paperwork for the sale itself and the car loan financing." (*Id.*).

44. "When a car loan was financed, the funds from the financial institutions were transmitted by wire from the lending institution directly to Serra Nissan. With the profit acquired from the auto loan, the employees involved in the deal (salesperson, finance manager, sales manager and GSM), ***and the dealership***, were paid their commission." (*Id.*) (emphasis added).

### The Conspiracy

45. "From in or about August 2010 and continuing until in or about October 2013," (Exs. J, K), Indicted Persons and others "did knowingly and willfully conspire, combine, and agree with other persons, known and unknown to the Grand Jury, to commit offenses against the United States, that is":

(A) to devise and intend to devise a scheme and artifice to defraud a financial institution, and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344; and

(B) to devise and intend to devise a scheme and artifice to defraud financial institutions, Nissan North America, and Serra Nissan customers, to obtain money and property belonging to others by means of materially false and fraudulent pretenses, representations, and promises by use of interstate wire communications and transmissions, in violation of Title 18, United States Code, Section 1343.

(Exs. J, K) (*See* Ex. I).

### Manner and Means of the Conspiracy

46. "It was a part of the conspiracy that [Indicted Persons] and others . . . conspired to increase the number of cars sold by fraudulent means; to inflate the prices of vehicles; to falsify vehicle purchasers; and to misrepresent vehicle values, in order to increase profits to

themselves." (Exs. I-K).

47. "It was a further part of the conspiracy that [Indicted Persons], and others . . . would falsify information or documents for customers that did not qualify for car loans, to ensure their car loans were funded." (*Id.*).

48. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would falsely and fraudulently inflate the income information of prospective car purchasers submitted to financial institutions so customers who otherwise would not qualify for car loan funding," (*id.*), "would show an artificially high income and would be able to obtain a loan," (Ex. I), "to ensure their car loans were funded," (Exs. J, K).

49. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would create false documents or materially alter existing documents, including, but not limited to bank statements and pay stubs, to be submitted to financial institutions to show that customers were earning more than their actual income." (Exs. I-K).

50. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would direct finance managers and salesmen to submit fraudulent utility bills and bank statements to financial institutions to misrepresent proof of the customer's residency during the car loan funding process." (*Id.*).

51. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would falsely and fraudulently state on a credit application that two individuals lived together when, in fact, they did not so financial institutions would believe there was a combined income greater than what actually existed for the individual customer." (*Id.*).

52. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would submit falsified information to financial institutions regarding what features were actually on the vehicle (*i.e.*, power seats, sunroofs, upgraded sound systems, running boards, towing packages, *etc.*), in order to artificially inflate the vehicle's retail value, so that the financial institution would increase the amount funded for the car." (*Id.*).

53. "It was a further part of the conspiracy that [Indicted Persons] and others . . . were

17

financially incentivized to increase the loan amount," (*id.*), "to increase commissions for certain employees," (Exs. J, K), "because if a vehicle was sold and the total profit was high enough to qualify as a 'drop deal,' an additional commission would be split between certain employees on the deal," (Ex. I).

54. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would also defraud financial institutions in instances where the financial institution required the customer to pay a certain amount of cash at the time of signing, by creating a false document that made it appear the customer paid a down payment, when in fact, it was paid by the dealership." (Exs. I-K).

55. It was a further part of the conspiracy that Indicted Persons "and others would coach customers that, if the bank called and asked about the down payment, the customers were to tell the financial institution that the customer, not the dealership, paid the down payment." (Ex. I). (*See* Exs. J, K).

56. It was a further part of the conspiracy that Indicted Persons "and others would also defraud financial institutions by making it appear that an individual who qualified for the loan purchased the vehicle when in truth and fact, the actual purchaser would not otherwise qualify." (Ex. I). (*See* Exs. J, K).

57. It was a further part of the conspiracy that Indicted Persons "and others defrauded financial institutions by fraudulently increasing the value of a customer's vehicle trade-in to increase the profit on a deal in order to qualify it as a 'drop deal.'" (Ex. I). (*See* Exs. J, K).

58. It was a further part of the conspiracy that Indicted Persons "and others defrauded customers and financial institutions by quoting a customer an inflated monthly payment on a vehicle they were interested in purchasing, so that a finance manager could add a warranty and gap insurance at the end of the transaction, without the customer realizing they were paying for them." (Ex. I). (*See* Exs. J, K).

59. If was further part of the conspiracy to "falsely report[ ] that vehicles were sold at Serra Nissan, when, in fact, they were sold at a different dealership, in order to obtain incentive