FILED
2015 Sep-21  PM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| RICHARD A. KEMP, JR. and GWENDOLYN HENDERSON, individually and on behalf of those similarly situated, | |
| Plaintiffs, | |
| vs. | Case No.: 2:15-cv-00914 |
| ANTHONY F. SERRA, an individual; SERRA NISSAN/OLDSMOBILE, INC., an Alabama corporation; SERRA VOLKSWAGEN, INC., an Alabama corporation; and  SERRA AUTOMOTIVE MANAGEMENT, INC.; an Alabama corporation, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Defendants. | |

Plaintiffs, RICHARD A.  KEMP, JR. and GWENDOLYN HENDERSON, individually and on behalf of all those similarly situated, allege:

### INTRODUCTION

1.      This lawsuit revolves around the predatory practices of automobile dealerships targeting lower-income borrowers and taking advantage of those without meaningful access to credit.  These consumers thought they were paying for a vehicle, but were unaware they were actually paying to increase the dealerships' profit margins through unlawful markups, unwanted add-ons, and fraudulently inflated sales prices.

### NATURE OF THE CASE

2.      This class action is brought under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961, *et seq.*) ("RICO"), the Alabama Consumer Identity Protection Act, and common law on behalf of Plaintiffs and putative class members (collectively "Plaintiffs," "Class," or "Class Members") that were injured by the predatory practices of Defendants Anthony F. Serra ("Tony Serra"), Serra Nissan/Oldsmobile, Inc. ("Serra Nissan"), Serra Volkswagen, Inc. ("Serra VW"), and Serra Automotive Management, Inc. ("Serra

Automotive Management") (collectively "Defendants") to fraudulently increase loan approvals, vehicle sales, and maximize profits for themselves.  In accomplishing this objective, Defendants and/or members of the Serra Enterprise, as a pattern and practice, intentionally used Plaintiffs' and Class Members' identifying information in a manner constituting identity theft under the Alabama Consumer Identity Protection Act for their own benefit and for the benefit of the Serra Enterprise.

3.     This type of fraudulent activity became so pervasive at Serra Nissan that charges were filed by the United States District Attorney's office and guilty pleas entered against numerous members of the Serra Enterprise, involving bank and wire fraud, theft of identity, conspiracy, and other illegal schemes.

4.     The criminal indictments and plea agreements related to the fraudulent scheme alleged in this Complaint are well-documented:

a.     In September 2013, Abdul Islam Mughal, a former general sales manager at Serra Nissan, was arrested (and later indicted on charges of conspiracy and bank fraud), and Defendants publicly "stress[ed] that the actions of a single individual are no reflection on the company's other loyal employees";[1]

b.     On August 27, 2014, Gerald R. Shepard, another former general sales manager at Serra Nissan, was indicted on charges of conspiracy and bank fraud, and Defendants claimed, "[T]hese allegations, while disappointing, should not be viewed as a reflection of our company or as a reflection of all of our employees who have always conducted themselves with honesty and honor";[2]

c.     On September 26, 2014, five more employees were indicted—two managers and three salesmen—on charges of conspiracy, bank fraud, wire fraud, and identity

---

[1] Kent Faulk, *Former sales manager at Serra Nissan in Birmingham indicted for falsifying customer loan documents*, AL.com (last updated Oct. 7, 2013, 5:16 PM), http://blog.al.com/spotnews/2013/10/former_sales_manager_at_serra.html.

[2] Kent Faulk, *Former Serra Nissan manager indicted in car loan fraud scheme; one other already charged*, AL.com (last updated Sept. 4, 2014, 3:08 PM), http://www.al.com/news/birmingham/index.ssf/2014/09/former_serra_nissan_manager_in.html.

theft, and Defendants responded, "The actions of a few former employees should not be viewed as a reflection of our company or our many employees who conduct business with complete integrity";[3] and

       d.    On December 30, 2014, Jeffrey R. Green, a former finance manager at Serra Nissan, was charged with conspiracy and entered a plea agreement. When notified of the charges, Defendants suggested that Green was simply another "former employee[ ] . . . accused of failing to live up to the values that are the foundation of our longtime success" and that his actions "should not be viewed as a reflection of our company."[4]

       5.    Yet, these were not the acts of a few "rogue" employees. Plaintiffs were victimized by the same predatory practices charged in the indictments by the concerted actions of a salesman at Serra Volkswagen, Inc., Andy Taylor, and a manager at Serra Nissan, Patrick Donlevy.

       6.    The reason Defendants' predatory practices permeate their businesses is simple— as "the foundation of" their "longtime success," they established, directed, and financially incentivized their employees to accomplish them:

       a.    Employees and associates "were ***financially incentivized to submit fraudulent documents and 'power book'*** at Serra Nissan, because if a vehicle was sold, and the total profit on the transaction was high enough to qualify it as a 'drop deal,' Serra Nissan would pay . . . employees on the deal an additional amount ***on top*** of their normal commission";[5]

---

[3] Kent Faulk, *Five former Serra Nissan employees arrested in federal probe*, AL.com (last updated Oct. 1, 2014, 6:44 PM), http://www.al.com/news/birmingham/index.ssf/2014/10/five_former_serra_nissan_emplo.html.

[4] Kent Faulk, *8th former Serra Nissan manager charged in federal fraud probe*, AL.com (last updated Dec. 30, 2014, 10:08 PM), http://www.al.com/news/birmingham/index.ssf/2014/12/8th_former_serra_nissan_manage.html.

[5] Plea Agreement of Abdul Islam Mughal (Doc. 1-3); Plea Agreement of Gerald R. Shepard (Doc. 1-4) (emphasis added); *see also* Information of Jeffrey R. Green and Waiver of an Indictment (Doc. 1-13) ("It was a further part of the conspiracy that defendant [Green], and others both known and unknown to the United States Attorney, were financially incentivized to increase the loan amount to increase commissions for certain employees."). "Power booking" refers to the process of submitting "falsified information to financial institutions regarding what features were actually on the vehicle, i.e., power seats, sunroofs, towing packages, etc., in order to artificially inflate the vehicle's retail value, so that the financial institution would increase the amount funded for the car." (*E.g.*, Docs. 1-3, 1-4).

b.      Employees and associates "were instructed by management, as a **_policy and practice_** at the dealership, to shred original credit applications filled out by certain customers so there was no record of the customer's actual income";[6] and

c.      Employees and associates "falsely report[ed] that vehicles were sold at Serra Nissan, when, in fact, they were sold at a different dealership, in order to obtain incentive payments to which Serra Nissan was not entitled"[7] without the fraudulent representation.

7.      There was a pervasive scheme throughout Defendants' automobile dealerships, which was carried on at Defendants' direction, with their participation, or with their full knowledge, approval, and ratification, that if a prospective customer did not qualify for a vehicle loan, an employee or associate would falsify information and submit fraudulent documents to financial institutions to ensure the customer was funded; fraudulently inflate the value of a vehicle by listing accessories it did not actually include to increase loan amount; and among other things, "pack" the loan with the cost of add-on products—such as a vehicle service contract, warranty, or gap contract—without the customer's knowledge.

8.      Defendants' predatory practices threaten not only consumer safety but also the nation's financial system.  As noted by FBI Special Agent in Charge Richard D. Schwein Jr., "'This case is significant . . . not merely because of the loss amounts but also because of the many victims left in the wake of this scheme who had trusted the defendants with handling their vehicle financing.'"[8] "Predatory practices in providing auto loans to people with credit problems or insufficient income is akin to the fraud in mortgage lending," stated U.S. Attorney Joyce White Vance.[9] "This type of fraud is the auto-industry equivalent of the mortgage fraud that contributed to the financial meltdown, and could threaten the security of our financial

---

[6] Doc. 1-13 (emphasis added).
[7] _Id._
[8] FBI, Birmingham Division, _Two Serra Nissan Managers and Three Salesmen Charged in Loan Fraud Conspiracy_, FBI.gov (Oct. 1, 2014), http://www.fbi.gov/birmingham/press-releases/2014/two-serra-nissan-managers-and-three-salesmen-charged-in-loan-fraud-conspiracy.
[9] FBI, Birmingham Division, _Four Serra Nissan Employees Plead Guilty in Auto Loan Fraud Conspiracy_, FBI.gov (Mar. 11, 2015), http://www.fbi.gov/birmingham/press-releases/2015/four-serra-nissan-employees-plead-guilty-in-auto-loan-fraud-conspiracy.

markets."[10]

9.      Defendants intended to and have benefited from the fraudulent scheme by, among other things, increasing the number of cars sold to buyers that otherwise would not have been approved for a loan, inflating the prices of vehicles, and packing loans to incorporate the cost of add-on products without the buyer's knowledge in order to maximize vehicle sales, profits, and commissions for themselves.

10.      As noted by IRS Criminal Investigation Special Agent in Charge Veronica Hyman-Pillot, Defendants and their employees "clearly took advantage of the people in their community, as well as financial institutions. They manipulated the system and falsified documents with the intention of increasing profits at the expense of others."[11]   Defendants, however, received the greatest benefit; their profit margins and commissions continued to grow through unlawful markups, unwanted add-ons, and fraudulently inflated sales prices.

11.      Pursuant to Rules 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following Class:

> **All individuals in the United States who received an automobile loan processed by Serra Nissan.**

Excluded from the Class are the following individuals and/or entities:

a.      Any and all federal, state, or local governments, including but not limited to their department, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

b.      Individuals, if any, who timely opt out of this proceeding using the correct protocol for opting out;

c.      Individuals, if any, who have previously settled or compromised claims(s) as identified herein for the Class; and

---

[10] *Two Serra Nissan Managers and Three Salesmen Charged in Loan Fraud Conspiracy*, *supra* note 8.
[11] *Four Serra Nissan Employees Plead Guilty in Auto Loan Fraud Conspiracy*, *supra* note 9.

      d.      Any currently sitting federal judge and/or person within the third degree of consanguinity to any federal judge.

12.     This class action seeks to recover damages stemming from Defendants' fraudulent activities prohibited under RICO; compensation for unjust enrichment, fraud, civil conspiracy, and negligence; and declaratory and injunctive relief.

## JURISDICTION AND VENUE

13.     Jurisdiction is conferred on this Court by 18 U.S.C. § 1964(a), (c) and 28 U.S.C. § 1331 as these matters arise under the laws of the United States of America.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims of Plaintiffs and Class Members occurred here, and is proper pursuant to 18 U.S.C. § 1965(a) because the Defendants transacted their affairs here.  Defendants do substantial business in the State of Alabama and within this District, are registered to and are doing business within this State, and otherwise maintain requisite minimum contacts with this State and this District.  Additionally, Defendants' principal places of business are in this District, and they receive substantial compensation and profits from their business in this District.  Defendants are therefore subject to *in personam* jurisdiction in this District, and venue is proper because Defendants reside in this District.

## PARTIES

15.     Plaintiff RICHARD A. KEMP, JR is, and was at all times relevant, an adult resident of Jefferson County, Alabama.

16.     Plaintiff, GWENDOLYN HENDERSON is, and was at all times relevant, an adult resident of Jefferson County, Alabama.

17.     Defendant, ANTHONY F. SERRA ("Tony Serra") is an individual over the age of nineteen and a resident of Jefferson County, Alabama.

18.     Defendant SERRA NISSAN/OLDSMOBILE, INC. ("Serra Nissan") is a domestic corporation, organized and existing under the laws of Alabama, with its principal place of business at 1500 Center Point Pkwy, Birmingham, AL 35215, and its registered office address at 9709 Parkway East, Ste. D, Birmingham, AL 35215.

19.     Defendant SERRA VOLKSWAGEN, INC. ("Serra VW") is a domestic corporation, organized and existing under the laws of Alabama, with its principal place of business at 1490 Center Point Pkwy, Birmingham, AL 35215, and its registered office address at 9709 Parkway East, Ste. D, Birmingham, AL 35215.

20.     Defendant, SERRA AUTOMOTIVE MANAGEMENT, INC. ("Serra Automotive Management") is a domestic corporation, organized and existing under the laws of Alabama, with its registered office address at 9709 Parkway East, Ste. D, Birmingham, AL 35215.

## FACTUAL ALLEGATIONS

21.     Defendants and their co-conspirators, on their own and as part of a common fraudulent scheme and conspiracy, defrauded customers, financial institutions, and motor vehicle manufacturers by means of materially false and fraudulent pretenses, representations, promises, or omissions.  Defendants implemented and executed the fraudulent scheme through mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), and identity fraud (18 U.S.C. §§ 1028 and 1028A).

## I.     The Serra Enterprise

22.     The following persons constitute a group of individuals and entities associated in fact and referred to in this Complaint as the "Serra Enterprise":

          a.     Serra Nissan/Oldsmobile, Inc.,

          b.     Serra Volkswagen, Inc.,

          c.     Serra Automotive Management, Inc.,

          d.     Anthony F. Serra,

          e.     Randy D. Visser,

          f.     Kimberly H. Branch,

g.      Abdul Islam Mughal,

h.      Gerald R. Shepard,

i.      D. Scott Burton,

j.      Michael J. Wilkerson,

k.      Jeffrey R. Green,

l.      Dwight A. Perry,

m.      Terry W. Henderson, Jr.,

n.      Roland W. Riley,

o.      Andy Taylor,

p.      Patrick Donlevy,

q.      A to Z Confidential Investigations, Inc.,

r.      Other unnamed vehicle dealerships, and

s.      Other unnamed officers, directors, salesmen, general managers, general sales managers, sales managers, finance managers, and/or outside consultants providing services for Serra Nissan, Serra VW, Serra Automotive Management, and/or other unnamed vehicle dealerships.

23.     The Serra Enterprise is an "enterprise," as defined by 18 U.S.C. § 1961(4), engaged in and whose activities affect interstate commerce.  The Serra Enterprise engages in and its activities affect interstate and foreign commerce by, among other things, buying and receiving automobiles from multi-national companies that are transported across state lines, receiving funds from lending institutions by interstate wire transmission, and conducting fundamental aspects of its business through the U.S. mail, interstate commercial carrier, wire or other interstate electronic media.

24.     Defendants and all other members of the Serra Enterprise are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).  Plaintiffs and Class Members are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

25.     Defendant Tony Serra is the President of Serra Nissan and Serra VW, and he is

8

the chairman of Serra Automotive Management.  He exercises a managerial role in the affairs of Serra Nissan, Serra VW, and Serra Automotive Management and therefore in the affairs of the Serra Enterprise.

26.     Defendants Serra Nissan and Serra VW are engaged in the business of selling and servicing new and used automobiles.  Despite a common officer, Defendants Serra Nissan Serra VW are each a separate and distinct Alabama corporation; each has a separate ongoing business with a separate customer base; and each is free to act independently and advance its own interests contrary to those of the other.  Although Defendants Serra Nissan and Serra VW are affiliated, neither is a parent or subsidiary corporation of the other.

27.     Defendant Serra Automotive Management provides management advice and direction exclusively to the Serra-affiliated motor vehicle dealerships, but it does not sell motor vehicles directly to consumers.  Despite common officers, Defendant Serra Automotive Management is a separate and distinct entity from any other Serra-affiliated motor vehicle dealership; it has a separate ongoing business; and it is free to act independently and advance its own interests contrary to those of the other Serra-affiliated motor vehicle dealership.  Serra Automotive Management is not a parent or subsidiary of any Defendant or other Serra-affiliated motor vehicle dealership.  Serra Automotive Management does not enter into arbitration agreements with consumers, including Plaintiffs and Class Members.

28.     Defendants Serra Nissan, Serra VW, Tony Serra, and Serra Automotive Management are not the Serra Enterprise itself; rather, each is associated with the Serra Enterprise and a perpetrator of the racketeering activity alleged in this Complaint.  Each participated in and controlled the affairs of the enterprise, as the Serra Enterprise's fraudulent scheme could not have been successful without Defendants' direction, participation in, or knowledge, approval, and ratification of the overt acts carried out in furtherance of the enterprise's fraudulent scheme.

29.     The Serra Enterprise has an ascertainable structure and purpose beyond the scope and commission of the predicate acts and conspiracy to commit such acts.  At all relevant times,

each Defendant and member of the enterprise also engaged in the business of either selling and servicing new and used automobiles or providing management services by lawful, non-fraudulent means to customers that qualified for a loan.

30.     From at least August 2010 until at least October 2013, members of the Serra Enterprise, at the direction of Defendants, with their participation or with their knowledge, approval, and ratification, committed and conspired to commit a series of related fraudulent acts for the common or shared purpose of submitting false information and fraudulent documents to financial institutions to ensure a prospective customer would receive a loan if they did not otherwise qualify for a loan.  The ultimate objective of the fraudulent scheme was to increase the number of cars sold by fraudulent means and to inflate the prices of vehicles in order to maximize Defendants' vehicle sales, profits, and commissions.

31.     Additional wrongdoers listed in Paragraph 22 that are not named as Defendants include without limitation:

a.      Abdul Islam Mughal "worked at Serra Nissan and other Serra entities intermittently over the last 14 years, most recently as a General Sales Manager (GSM) at Serra Nissan.  As the GSM at Serra Nissan during the relevant time period, Mughal supervised the sales process, including the front end customer sales interaction, and the back end financing conducted by finance managers.  Mughal also dealt directly with customers on the front end of many transactions."  (Doc. 1-3).

b.      Gerald R. Shepard was a sales manager at Serra Nissan beginning in June 2009.  "As the Sales Manager at Serra Nissan during the relevant time period, Shepard supervised the sales process, including the front end customer sales interaction, and the back end financing conducted by finance managers.  Shepard also dealt directly with customers on the front end of many transactions."  (Doc. 1-4).

c.      D. Scott Burton "began working for Serra Nissan as a sales manager in July, 2012. . . .  As a sales manager, Burton was responsible for selling cars to customers who came in to the dealership, and also assisted other salesmen with 'closing' their deals with

customers." (Plea Agreement of D. Scott Burton, Doc. 1-5).

       d.     Michael J. Wilkinson "worked on and off for Serra Nissan, most recently, as a finance manager until March 2013. . . .  As one of the finance managers at Serra Nissan during the relevant time period, Wilkinson was responsible for the back-end financing process. That process included submitting information to financial institutions in order to secure car loan financing for prospective customers." (Plea Agreement of Michael J. Wilkinson, Doc. 1-6).

       e.     Jeffrey R. Green "was a Finance Manager at Serra Nissan" and he "worked at Serra Nissan from September 1, 2011, until he was terminated in October 2013.  As one of the Finance Managers at Serra Nissan during the relevant time period, Green was responsible for the back-end financing process.  That process included submitting information to financial institutions in order to secure car loan financing for prospective customers." (Plea Agreement of Jeffrey R. Green, Doc. 1-7).

       f.     Dwight A. Perry "worked for Serra Nissan twice during his sixteen years as a car salesman.  Most recently, Perry worked as a salesman at Serra Nissan from 2010 until October 2013. . . .  As a salesman, Perry was responsible for selling cars to customers who came in to the dealership, and he also contacted customers over the phone to invite them to come to the dealership to purchase a car." (Plea Agreement of Dwight A. Perry, Doc. 1-8).

       g.     Terry W. Henderson, Jr. "worked for Serra Nissan as a car salesman. . . . As a salesman, Henderson was responsible for selling cars to customers who came in to the dealership, and he also contacted customers over the phone to invite them to come to the dealership to purchase a car." (Plea Agreement of Terry W. Henderson, Jr., Doc. 1-9).

       h.     Roland W. Riley "worked as a salesman at Serra Nissan" during the relevant time, and "[a]s a salesman, Riley was responsible for selling cars to customers who came in to the dealership, and he also contacted customers over the phone to invite them to come to the dealership to purchase a car." (Plea Agreement of Roland W. Riley, Doc. 1-10).

       i.     Andy Taylor worked as a salesman at Serra VW during the relevant time. As a salesman at Serra VW, Taylor was responsible for selling cars to customers who came in to

the dealership, and he also contacted customers over the phone to invite them to come to the dealership to purchase a car.  Taylor was the salesman that sold Plaintiffs their Corolla.

j.      Patrick Donlevy worked as either a sales manager or finance manager at Serra Nissan.  As one of the managers at Serra Nissan during the relevant time period, Donlevy was responsible for assisting other salesmen with "closing" their deals with customers; supervising the sales process, including the front end customer sales interaction, and the back end financing conducted by finance managers; and having customers sign the closing paperwork, including the paperwork for the sale itself and the car loan financing.  Donlevy assisted Taylor in selling Plaintiffs their Corolla.

k.      A to Z Confidential Investigations, Inc. provides investigative services and has been hired by Defendants Serra Nissan, Serra VW, Serra Automotive Management and/or Tony Serra to engage in a course of business dealing to further carry out and conceal the Serra Enterprise's fraudulent scheme by contacting Plaintiffs and Class Members for the purpose of negotiating, drafting, and securing a written release of Plaintiffs' legal rights against Defendants Serra Nissan, Serra VW, Serra Automotive Management and/or Tony Serra through false pretenses, representations, promises, or omissions.

l.      Randy K. Visser "was the General Manager at Serra Nissan[.] . . . As the General Manager at Serra Nissan during the relevant time period, Visser was responsible for overseeing sales and service, and was directly in charge of all marketing and advertising.  (Plea Agreement of Randy D. Visser, Doc. 10-4).  He was also a co-owner of Serra Visser Nissan in Cullman, Alabama, which was "co-owned by Randy D. Visser (49%), Anthony Serra (49%), and Kristina Serra Visser (2%)."  (*Id.*).

m.      Kimberly H. Branch "was the Controller at Serra Nissan."  (Indictment of Kimberly H. Branch, Doc. 10-5).

**II.      The Vehicle Financing Process**

32.      Defendants sell new and used vehicles and often assist prospective buyers with obtaining car loans, or otherwise provide management advice and direction exclusively to the

Serra-affiliated motor vehicle dealerships.

33.     When a prospective buyer needs to obtain a car loan, the dealership collects their identifying information, including social security number, credit score, pay stubs, home address, personal references, and other information required by financial institutions in-person or through the U.S. mail, commercial interstate carrier, wire or other interstate electronic media.

34.     Before a financial institution provides financing, the dealership is required to verify a prospective buyer's identifying information, including but not limited to:

> a.     a personal reference sheet,
>
> b.     a valid driver's license for the buyer and co-buyer,
>
> c.     proof of income for the buyer and co-buyer,
>
> d.     proof of residence for the buyer and co-buyer,  and/or
>
> e.     proof of insurance.

35.     A sales manager then enters the prospective buyer's information in a database that submits their information to multiple financial institutions.  The financial institutions could then respond with a financing offer, if any, to the customer.  A finance manager would provide the prospective buyer with closing paperwork, including the paperwork for the sale itself and the car loan financing.

36.     When a loan is financed, the funds from the financial institution are transmitted by wire from the lending institution directly to the dealership, causing wire communications to be made across state lines.  From these funds, the dealership, employees, and associates involved in the deal are paid their commission.

37.     After the buyer signs the closing paperwork, the dealership is then required to send the funding required documents to the lending institution, including without limitation:

> a.     the original credit application;
>
> b.     the buyer's identifying information, including the reference sheet, a valid driver's license and  proof of income;
>
> c.     the original executed Retail Installment Sales Contract ("RISC");

     d.     a copy of the Retail Order, Buyer's Order or Bill of Sale;

     e.     a copy of the title application;

     f.     the gap contract forms; and

     g.     the Vehicle Service Contract (or  other similar extended service contract).

38.    The dealership then submits the funding required documents to the lending institution through the U.S. mail or commercial interstate carrier.  Lending institutions will not accept the funding required documents by wire or other interstate electronic media.

## III.    The Racketeering Scheme, Criminal Indictments, and Plea Agreements

39.    From at least August 2010 and continuing until at least October 2013, members of the enterprise, at the direction of Defendants, with their participation, or with their full knowledge, approval, and ratification, fraudulently increased loan approvals and vehicle sales by creating or altering documents to inflate the income for prospective buyers; submitted fraudulent documents to financial institutions; listed accessories not actually included on a vehicle so a financial institution would increase its loan amount; increased the vehicle sales price without the customer's knowledge; presented "straw buyers" who could qualify for a loan to financial institutions when the actual buyer could not qualify; and quoted prospective buyers an inflated monthly payment so Defendants could add a Vehicle Service Contract and/or Gap Contract at the end of the transaction without the buyer's knowledge.

40.    The acts and practices used by Defendants and members of the enterprise in furtherance of the fraudulent scheme include:

     a.     **"Fluffing"** refers to the act of fraudulently inflating "the income information of prospective car purchasers submitted to financial institutions so customers that would otherwise not qualify for car loan funding, would show an artificially high income and would be able to obtain a loan." (*E.g.* Docs. 1-3, 1-4).

     b.     **"Power Booking"** refers to the act of submitting "falsified information to financial institutions regarding what features were actually on the vehicle, i.e., power seats, sunroofs, towing packages, etc., in order to artificially inflate the vehicle's retail value, so that

the financial institution would increase the amount funded for the car." (*Id.*).

        c.    **"Drop Deal"** refers to a transaction where Defendants would pay their salesmen, finance managers, sales managers, or GSMs additional compensation on top of their normal commission because the total profit on the transaction was increased as a result of submitting fraudulent documents and "power booking." (*See id.*).

        d.    **"Payment Packing"** refers to the act of quoting the customer an inaccurately high monthly payment that incorporates the cost of additional products—such as a vehicle service contract, warranty, or gap contract—that have not been properly disclosed to the customer; the customer was not made aware that the difference between the true monthly payment and the inaccurately high monthly payment has been built into the deal.

        e.    **"Straw Buyer"** refers to the act of "making it appear that an individual who qualified for the loan . . . purchased the vehicle when in truth and fact, the actual purchaser would not otherwise qualify because they had poor credit, insufficient income, no proof of residency, etc." (*Id.*).

    41.    Defendants intended to and have benefited from the fraudulent scheme by, among other things, increasing the number of cars sold to buyers that otherwise would not have been approved for a loan, inflating the prices of vehicles, and packing loans to incorporate the cost of add-on products without the buyer's knowledge in order to maximize vehicle sales, profits, and commissions for themselves

    42.    Defendants' direction of, participation in, or knowledge, approval, and ratification of the fraudulent scheme is demonstrated by, among other things, the fact that Defendants "***financially incentivized***" members of the Serra Enterprise "to submit fraudulent documents and 'power book'" by paying the "employees on the deal an additional amount on top of their normal commission," (Docs. 1-3, 1-4); "as a ***policy and practice***," instructed members of the enterprise "to shred original credit applications filled out by certain customers so there was no record of the customer's actual income"; and "falsely report[ed] that vehicles were sold at Serra Nissan, when,

in fact, they were sold at a different dealership, in order to obtain incentive payments" that Defendants were not otherwise entitled without the misrepresentation. (Doc. 1-13).

###### A.     Criminal Charges and Indictments Related to the Serra Enterprise

43.     Eight members of the Serra Enterprise—Mughal, Burton, Shepard, Wilkerson, Green, Perry, Henderson, and Riley (collectively "Indicted Persons")—were indicted or consented to prosecution by information on charges of conspiracy (18 U.S.C. § 371), bank fraud (18 U.S.C. §§ 1344, 1349 and 2), wire fraud (18 U.S.C. §§ 1343, 1349, and 2), identity theft (18 U.S.C. §§ 1028A and 2), and/or aiding and abetting bank fraud, wire fraud, and/or identity theft in connection with the Serra Enterprise's fraudulent scheme. (Information of Abdul Islam Mughal and Waiver of an Indictment, Doc. 1-11); (Indictment of Gerald R. Shepard, Doc. 1-12); (Indictment of D. Scott Burton, Michael J. Wilkinson, Dwight A. Perry, Terry W. Henderson, Jr., and Roland W. Riley; Information of Jeffrey R. Green and Waiver of an Indictment, Doc. 1-13).

###### Facts Common to All Indictments

44.     "As part of the car loan funding process, Serra Nissan collected personal information from prospective customers, including, but not limited to, customers' social security numbers, credit scores, monthly income, pay stubs, current home addresses, personal references, and other information required by financial institutions in order to fund car loans.  Some of that information was gathered when the customer came in and spoke to a salesman, while more detailed information was collected at the final signing or financing, conducted by a finance manager.  The entire process was overseen by the General Sales Manager ('GSM') or a sales manager." (Docs. 1-11 to 1-13).

45.     "When a customer initially provided information to a salesman, the salesman would enter that information into a software program used by Serra Nissan to store and track information on its customers.  If a customer needed to obtain a car loan, the GSM or a sales manager would enter the customer's information into a different online database that submitted their information to multiple financial institutions simultaneously.  The financial institutions could then respond with what financing, if any, they were willing to offer the customer.  If a

financial institution approved the transaction, the customer would be sent to the financing department to negotiate their loan price.  There, they would meet with a finance manager who would provide them with their closing paperwork, including the paperwork for the sale itself and the car loan financing." (*Id.*).

46.     "When a car loan was financed, the funds from the financial institutions were transmitted by wire from the lending institution directly to Serra Nissan.  With the profit acquired from the auto loan, the employees involved in the deal (salesperson, finance manager, sales manager and GSM), ***and the dealership***, were paid their commission." (*Id.*) (emphasis added).

### The Conspiracy

47.     "From in or about August 2010 and continuing until in or about October 2013," (Docs. 1-12, 1-13), Indicted Persons and others "did knowingly and willfully conspire, combine, and agree with other persons, known and unknown to the Grand Jury, to commit offenses against the United States, that is":

(A)     to devise and intend to devise a scheme and artifice to defraud a financial institution, and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344; and

(B)     to devise and intend to devise a scheme and artifice to defraud financial institutions, Nissan North America, and Serra Nissan customers, to obtain money and property belonging to others by means of materially false and fraudulent pretenses, representations, and promises by use of interstate wire communications and transmissions, in violation of Title 18, United States Code, Section 1343.

(*Id.*) (*See* Doc. 1-11).

### Manner and Means of the Conspiracy

48.     "It was a part of the conspiracy that [Indicted Persons] and others . . . conspired to increase the number of cars sold by fraudulent means; to inflate the prices of vehicles; to falsify

vehicle purchasers; and to misrepresent vehicle values, in order to increase profits to themselves." (Docs. 1-11 to 1-13).

49. "It was a further part of the conspiracy that [Indicted Persons], and others . . . would falsify information or documents for customers that did not qualify for car loans, to ensure their car loans were funded." (*Id.*).

50. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would falsely and fraudulently inflate the income information of prospective car purchasers submitted to financial institutions so customers who otherwise would not qualify for car loan funding," (*id.*), "would show an artificially high income and would be able to obtain a loan," (Doc. 1-11), "to ensure their car loans were funded," (Docs. 1-12, 1-13).

51. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would create false documents or materially alter existing documents, including, but not limited to bank statements and pay stubs, to be submitted to financial institutions to show that customers were earning more than their actual income." (Docs. 1-11 to 1-13).

52. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would direct finance managers and salesmen to submit fraudulent utility bills and bank statements to financial institutions to misrepresent proof of the customer's residency during the car loan funding process." (*Id.*).

53. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would falsely and fraudulently state on a credit application that two individuals lived together when, in fact, they did not so financial institutions would believe there was a combined income greater than what actually existed for the individual customer." (*Id.*).

54. "It was a further part of the conspiracy that [Indicted Persons] and others . . . would submit falsified information to financial institutions regarding what features were actually on the vehicle (*i.e.*, power seats, sunroofs, upgraded sound systems, running boards, towing packages, *etc.*), in order to artificially inflate the vehicle's retail value, so that the financial institution would increase the amount funded for the car." (*Id.*).

55.     "It was a further part of the conspiracy that [Indicted Persons] and others . . . were financially incentivized to increase the loan amount," (*id*.), "to increase commissions for certain employees," (Docs. 1-12, 1-13), "because if a vehicle was sold and the total profit was high enough to qualify as a 'drop deal,' an additional commission would be split between certain employees on the deal," (Doc. 1-11).

56.     "It was a further part of the conspiracy that [Indicted Persons] and others . . . would also defraud financial institutions in instances where the financial institution required the customer to pay a certain amount of cash at the time of signing, by creating a false document that made it appear the customer paid a down payment, when in fact, it was paid by the dealership." (Docs. 1-11 to 1-13).

57.     It was a further part of the conspiracy that Indicted Persons "and others would coach customers that, if the bank called and asked about the down payment, the customers were to tell the financial institution that the customer, not the dealership, paid the down payment." (Doc. 1-11). (*See* Docs. 1-12, 1-13).

58.     It was a further part of the conspiracy that Indicted Persons "and others would also defraud financial institutions by making it appear that an individual who qualified for the loan purchased the vehicle when in truth and fact, the actual purchaser would not otherwise qualify." (Doc. 1-11). (*See* Docs. 1-12, 1-13).

59.     It was a further part of the conspiracy that Indicted Persons "and others defrauded financial institutions by fraudulently increasing the value of a customer's vehicle trade-in to increase the profit on a deal in order to qualify it as a 'drop deal.'" (Doc. 1-11). (*See* Docs. 1-12, 1-13).

60.     It was a further part of the conspiracy that Indicted Persons "and others defrauded customers and financial institutions by quoting a customer an inflated monthly payment on a vehicle they were interested in purchasing, so that a finance manager could add a warranty and gap insurance at the end of the transaction, without the customer realizing they were paying for them." (Doc. 1-11). (*See* Docs. 1-12, 1-13).

61.     If was further part of the conspiracy to "falsely report[ ] that vehicles were sold at Serra Nissan, when, in fact, they were sold at a different dealership, in order to obtain incentive payments to which Serra Nissan was not entitled." (Doc. 1-13).

**Overt Acts in Furtherance of the Conspiracy:**
**Shepard, Burton, Wilkinson, Perry, Henderson and Riley**

62.     "In furtherance of the conspiracy and to achieve the objects thereof," Shepard, Burton, Wilkinson, Perry, Henderson and Riley "and others . . . committed and caused to be committed the following overt acts, among others, in the Northern District of Alabama and elsewhere" (Docs. 1-12, 1-13):

      a.     "On or about August 26, 2010," Riley "attempted to sell a car to a customer named C.M." (*Id.*).

      b.     "Because C.M. would not qualify for a car loan, on or about August 26, 2010," Shepard told Riley "that the car would have to be bought in the name of S.G., C.M.'s relative." (*Id.*).

      c.     "On or about August 30, 2010," Shepard and Riley "sold and financed a car in S.G.'s name, knowing the car was actually for C.M." (*Id.*).

      d.     "Between September 17, 2012, and October 11, 2012," Shepard, Wilkinson, Perry and Riley "sold five different vehicles, to one customer named J.D., knowing that four of the vehicles were actually for people other than J.D." (*Id.*).

      e.     "On or about September 17, 2012," Perry "submitted, or caused to be submitted, inflated income information to financial institutions regarding customer J.D.'s monthly income." (*Id.*).

      f.     "On or about September 17, 2012," Perry "told customer J.D. that if the bank called J.D. to confirm the information submitted during the loan application process, J.D. was to tell the bank the higher income amount, not J.D.'s actual income." (Docs. 1-12, 1-13).

      g.     "Between September 17, 2012, and October 11, 2012," Shepard, Wilkinson, Perry and Riley "financed four of the vehicles J.D. purchased in J.D.'s name,

representing to the lender that J.D. was the purchaser of the vehicle when, in truth and fact, the vehicles were for other people." (*Id*.).

**Overt Acts in Furtherance of the Conspiracy: Green**

63.     "In February 2012," Green "began preparing false documents to support customer loan applications at Serra Nissan." (Doc. 1-13).

64.     "At the request of the GSM," Green "would create fake bank statements, power bills, personal references, and pay stubs, knowing they would be submitted to financial institutions." (*Id*.).

65.     Green "had a template for a bank statement on his computer at Serra Nissan.  For certain car sales," Green "would change the information on the template to reflect the new information needed to get the deal funded." (*Id.*).

66.     Green "and others known . . . were instructed by management, as a policy and practice at the dealership, to shred original credit applications filled out by certain customers so there was no record of the customer's actual income." (*Id.*).

67.     "On or about October 18, 2012," Green, at the request and direction of [Wilkinson] and [Shepard], created two false bank statements and submitted them to Capital One Auto Finance, on behalf of customers J.T. and W.K." (*Id.*).

**Overt Acts in Furtherance of the Conspiracy: All Indicted Persons**

68.     "In furtherance of the conspiracy and to achieve the objects thereof," Mughal, Shepard, Burton, Wilkinson, Perry, Henderson and Riley "and others . . . committed and caused to be committed the following overt acts, among others, in the Northern District of Alabama and elsewhere," (Docs. 1-11 to 1-13):

        a.      "On or about October 17, 2012," Mughal, Shepard, another sales manager and a salesman attended a meeting. (*Id*.).

        b.      "On or about October 17, 2012," Mughal told a salesman "that two recent deals could not be funded until they created a 'legal lie' for the bank that showed the customer making more income." (*Id*.).

      c.     "On or about October 17, 2012," Mughal, Shepard and others "told [a] Salesman [ ] to go out and make the deal show that the customer made more per month than what the customer told [the] Salesman [ ]." (*Id.*).

      d.     "On or about October 17, 2012," Mughal, Shepard and others "told [the] Salesman [ ] that if he could not make the paperwork showing the customers made enough money, the deal would have to be split with another salesman who could make the documents necessary to fund the deal." (*Id.*).

**Bank Fraud**

69.     "From in or about August 2010 and continuing until in or about October 2013, the exact dates being unknown," Indicted Persons "devised a scheme and artifice to defraud financial institutions then insured by the FDIC, as identified below, and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of said financial institutions, by means of materially false and fraudulent pretenses, representations, and promises." (Docs. 1-12, 1-13). (*See* Doc. 1-11).

70.     "It was part of the scheme and artifice that the" Indicted Persons, "with the intent to defraud, engaged in the conduct set forth in" this Complaint. (Docs. 1-11 to 1-13).

71.     "On or about the date listed more specifically below for each count, in or around Jefferson County, within the Northern District of Alabama, and elsewhere, the [Indicted Persons] . . . knowingly executed, and attempted to execute, the scheme and artifice as set forth above, in that the [Indicted Persons] more specifically identified below for each count, aided and abetted by others known and unknown . . . made false representations, and submitted fraudulent information to the financial institutions more specifically identified below for each count, on behalf of Serra Nissan customers more specifically identified below for each count" all "in violation of Title 18, United States Code, Sections 1344, 1349, and 2":

| Date | Enterprise Member | Financial Institution | Customer |
|------|-------------------|-----------------------|----------|
| 9/17/2012 | Shepard | Santander Bank, N.A. | J.D. |
| 10/4/2012 | Wilkinson and Perry | SunTrust Bank | J.D. |
| 10/5/2012 | Shepard, Wilkinson, Perry and Riley | Capital One National Association | J.D. |
| 10/11/2012 | Wilkinson and Perry | JPMorgan Chase Bank | J.D. |
| 10/16/2012 | Mughal, Shepard, Burton and Wilkinson | Capital One National Association | J.T. |
| 10/16/2012 | Shepard, Burton and Wilkinson | Capital One National Association | W.K. |

(*See* Docs. 1-11 to 1-13).

## Wire Fraud

72.     "From in or about August 2010, and continuing until in or about October 2013, more exact dates being unable to be determined by the Grand Jury, the defendants, as identified below, did knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud the entities more specifically identified below for each count, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises." (Doc. 1-13).

73.     "It was part of the scheme and artifice that the defendants, specifically identified below for each count, with the intent to defraud, engaged in the conduct set forth in" this Complaint. (*Id.*).

74.     "On or about the dates set forth below, each such date constituting a separate count of this Indictment, in Jefferson County within the Northern District of Alabama, and elsewhere, the defendants more specifically identified below for each count, for the purpose of executing the above-described scheme and artifice and attempting to do so, did transmit and caused to be transmitted in interstate commerce, by means of a wire communication, certain signs, signals and communications, that is, defendants caused an interstate communication between Alabama and another state to be made on each occasion listed below, in which Serra Nissan received payment from the financing entity listed below for each count, for the sale of a

vehicle to the customers set forth below," all "in violation of Title 18, United States Code, Sections 1343, 1349, and 2":

| Date | Enterprise Member | Financing Entity | Customer |
|------|-------------------|------------------|----------|
| 9/24/2012 | Wilkinson and Perry | Nissan Motor Acceptance Corporation | J.D. |
| 9/26/2012 | Wilkinson and Perry | Santander Consumer USA | J.D. |
| 3/13/2013 | Wilkinson and Henderson | Nissan Motor Acceptance Corporation | M.A. |
| 3/20/2013 | Wilkinson and Henderson | Santander Consumer USA | M.A. |

(*Id.*).

## Identity Fraud

75.     "On or about September 17, 2012, in or around Jefferson County, within the Northern District of Alabama, and elsewhere," Perry and Henderson "aided and abetted by others known and unknown to the Grand Jury, knowingly did transfer and possess and use, without lawful authority, an Alabama-issued personal identification card belonging to J.D., knowing that this card was a means of identification of an actual person, during and in relation to the Bank Fraud and Wire Fraud, and the Conspiracy to commit same, as charged in Counts One through Ten of this Indictment," and "[a]ll in violation of Title 18, United States Code, Sections 1028A and 2." (*Id.*).

**B.     Plea Agreements Related to the Enterprise's Fraudulent Scheme**

76.     All Indicted Persons have pleaded guilty to at least one of the charges against them in relation to the Serra Enterprise's fraudulent scheme:

| Enterprise Member | Charge |
|-------------------|--------|
| Mughal | • Conspiracy (18 U.S.C. § 371) to commit wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344)<br>• Bank fraud (18 U.S.C. § 1344)<br>• Aiding and abetting bank fraud (18 U.S.C. § 2) |
| Shepard | • Conspiracy (18 U.S.C. § 371) to commit wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344)<br>• Bank fraud (18 U.S.C. §§ 1344, 1349)<br>• Aiding and abetting bank fraud (18 U.S.C. § 2) |
| Burton | • Conspiracy (18 U.S.C. § 371) to commit wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344) |

| Wilkinson | • Conspiracy (18 U.S.C. § 371) to commit wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344) |
|-----------|---|
| Greene | • Conspiracy (18 U.S.C. § 371) to commit wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344)<br>• Bank fraud (18 U.S.C. §§ 1344, 1349)<br>• Aiding and abetting bank fraud (18 U.S.C. § 2) |
| Perry | • Conspiracy (18 U.S.C. § 371) to commit wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344) |
| Henderson | • Conspiracy (18 U.S.C. § 371) to commit wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344) |
| Riley | • Conspiracy (18 U.S.C. § 371) to commit wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344) |

(Doc. 1-3 to 1-10). Each plea agreement "stipulate[d] that the facts stated [in the plea agreements] are substantially correct and that the Court can use these facts in calculating the [their] sentence[s]. [They] further acknowledge[d] that these facts do not constitute all of the evidence of each and every act that [they] and/or any co-conspirators may have committed." (*Id.*).

### Factual Basis for the Plea Agreements

77.     "Serra Nissan sells new and used cars and often assists customers with obtaining car loans. As part of the car loan funding process, Serra Nissan collects personal information from prospective customers, including, but not limited to, customers' social security numbers, credit scores, monthly income, pay stubs, current home addresses, personal references, and other information required by financial institutions in order to fund car loans. Some of that information is gathered at the time the customer enters the dealership and speaks to a salesman, while more detailed information is collected at the final signing or financing, conducted by a finance manager." (*Id.*). "The entire process is overseen by the General Sales Manager (GSM) and/or a sales manager." (*Id.*).

78.     "[T]here was a pervasive scheme throughout Serra Nissan, known among many of the salesman, finance managers, sales managers, and other Serra Nissan employees, that if a customer did not qualify for a car loan for some reason, the salesman, finance managers, sales managers, or GSM were to falsify information or documents that would ensure the customer was

funded." (*Id.*).

79.     Indicted Persons "and others, including Serra Nissan salesmen, general managers, GSM, sales managers, and finance managers, did willfully conspire and combine to submit materially false information to customers, Nissan North America, and financial institutions, with the intent to defraud them for personal financial gain." (Doc. 1-3 to 1-10).

80.     Indicted Persons "and others did also willfully conspire and combine to knowingly participate in a scheme to defraud financial institutions whereby they willfully submitted materially false information, with the specific intent to defraud the financial institutions, which caused wire communications to be transmitted in interstate commerce to help carry out the scheme to defraud." (*Id.*).

81.     Indicted Persons and others "directly participated in" and/or "directed others to participate in, several aspects of the scheme to defraud," including without limitation:

        a.     They "fraudulently inflate[d] the income information of prospective car purchasers submitted to financial institutions so customers that would otherwise not qualify for car loan funding, would show an artificially high income and would be able to obtain a loan. This process was sometimes called 'fluffing' a customer's income." (*Id.*).

        b.     They "defrauded customers and financial institutions by quoting a customer an inflated monthly payment on a vehicle they were interested in purchasing, so that a finance manager could add a warranty and gap insurance at the end of the transaction, without the customer realizing they were paying for them." (Docs. 1-3 to 1-4, 1-6 to 1-7).

        c.     "Where financial institutions required a stipulation as to proof of income," they "create[d] false documents, or alter[ed] existing documents, to be submitted to the financial institution making the loan," (*id.*), with the awareness that the sales they profited "from involved the submission of false documents," (Docs. 1-6, 1-8 to 1-10). "This process caused wire communications to be made across state lines." (Doc. 1-3 to 1-10).

        d.     "Where a financial institution required a stipulation as to proof of residency," they "submit[ted] fraudulent utility bills to the financial institution making the loan"

and "also falsified credit applications to show two individuals lived together when in fact, they did not, so financial institutions would believe there was a combined income greater than what actually existed for the individual customer." (Docs. 1-3 to 1-10).

e.     They "submit[ted] falsified information to financial institutions regarding what features were actually on the vehicle, i.e., power seats, sunroofs, towing packages, etc., in order to artificially inflate the vehicle's retail value, so that the financial institution would increase the amount funded for the car." (Docs. 1-3 to 1-5, 1-7). "This process was sometimes called 'power booking.'" (*Id.*).

f.     They "defraud[ed] lending financial institutions by making it appear that an individual who qualified for the loan, often referred to as a 'straw buyer,' purchased the vehicle when in truth and fact, the actual purchaser would not otherwise qualify because they had poor credit, insufficient income, no proof of residency, etc.," (Docs. 1-3 to 1-10), and on certain occasions, told "customer[s] that, if the bank called to ask about who, in fact, owned the car, the customer was to tell the bank the customer owned it, even though" it was known "the customer had purchased it for someone else," (Docs. 1-5, 1-8 to 1-10).

g.     They "fraudulently increase[d] the value of a customer's vehicle trade-in," (Docs. 1-3, 1-7), "or would fraudulently report that a customer had traded in a vehicle when, in fact, the customer had not," (Doc. 1-7).

h.     "In instances where the financial institution required customers to pay cash at the time of signing, also known as a down payment," they "would defraud financial institutions by falsifying documents that showed the customer paid the down payment, when in fact, it was paid by the dealership" and "would then coach customers that, if the bank called and asked, the customers were to tell the financial institution that the customer paid, not the dealership.  This was sometimes referred to as ***Serra Nissan's 'down payment assistance' program***." (Docs. 1-3 to 1-4,-1-6) (emphasis added).

82.     Further, members of the enterprise "were ***financially incentivized to submit fraudulent documents and 'power book'*** at Serra Nissan, because if a vehicle was sold, and the

total profit on the transaction was high enough to qualify it as a 'drop deal,' Serra Nissan would pay" Indicted Persons "and other employees on the deal *an additional amount on top of their normal commission*." (Docs. 1-3 to 1-4) (emphasis added).

## Overt Acts in Furtherance of the Conspiracy

83.    **Customer J.D.**

a.    "Between September 17, 2012, and October 11, 2012, Serra Nissan sold, or attempted to sell, five vehicles to a customer named J.D." (Docs. 1-6, 1-8 to 1-10). "Initially, J.D. called Serra Nissan and spoke with Perry about purchasing a vehicle. Because J.D. did not have a vehicle, Perry picked J.D. and his girlfriend up from J.D.'s apartment, and brought them to Serra Nissan. When they arrived at Serra Nissan, Perry input J.D.'s name, address, date of birth, social security number, income, and other information, into ProMax, a dealer management software program Serra Nissan used at that time. Once J.D.'s information was put into ProMax, J.D.'s credit application would have been given to the Sales Manager." (Doc. 1-8).

b.    "Because J.D. was on disability, J.D. only made about $796 per month. However, J.D.'s credit score was good enough that J.D. could qualify to purchase multiple cars, if the dealership could show that J.D. made enough money. Perry was aware that a sales manager increased J.D.'s income in Dealertrack so that J.D. would qualify for a car loan." (*Id.*).

c.    "The sales manager told Perry after entering the information into Dealertrack that J.D.'s income had been inflated, and how much it had been increased. The sales manager provided that information so that Perry could inform J.D. that, if the lender called J.D. to confirm his income after the purchase, J.D. would know to tell the lender the inflated income amount." (*Id.*).

d.    "The first car J.D. purchased was a Nissan Sentra that J.D. purchased for himself on or about September 24, 2012. However, because of J.D.'s good credit, J.D. was pre-approved by multiple lenders for a car loan. As a result, Perry, a salesman at Serra Nissan, sold J.D. additional cars. The second car J.D. purchased was for his girlfriend and the third car J.D. purchased was for his cousin." (Docs. 1-8 to 1-10).

e.      "Perry told J.D. that **_Serra Nissan would give him approximately $100_** **_for each car he bought_**.  Perry was aware that each vehicle J.D. purchased for someone else was a straw purchase." (Doc. 1-6) (emphasis added).

f.      "For the third car purchase, J.D. was required by the lender to have a valid driver's license. Because J.D. only had an identification card, Perry took a copy of the identification card to [Henderson], who was known to produce false driver's licenses when needed.  After he created it, [Henderson] showed Perry the copy of a false driver's license he had made for J.D. [Henderson] charged $50 for false identifications, such as copies of falsified driver's licenses." (Docs. 1-8 to 1-9).

g.      "The fourth car J.D. purchased was for . . . Riley," another salesman at Serra Nissan. (Docs. 1-8, 1-10). "Riley found out what Perry was doing with J.D., and asked Perry if Perry could get J.D. to buy him a car as well.  Perry asked J.D. to purchase another car for Riley, and J.D. agreed to do it. J.D. signed the loan documents, prepared by finance manager [Wilkinson], though the car was a straw purchase for Riley." (_Id._).

h.      "The fifth car J.D. purchased was also a straw purchase for someone else. Because four of the five vehicles were straw purchases for other people, Perry and the finance manager would have had a conversation with J.D. to tell him that if the lender called and asked questions, J.D. needed to tell the lender the vehicle was for him and not anyone else.  M.J.W. was the finance manager on all five sales involving J.D." (Doc. 1-8).

i.      "Wilkinson was the finance manager on all five cars that J.D. purchased, or attempted to purchase.  Wilkinson knew that J.D. was purchasing cars for other people, though the cars were only submitted for loan funding under J.D.'s name.  Wilkinson understood that four of J.D.'s five car purchases were straw purchases for others." (Doc. 1-6).

84.   **Customer M.A.**

a.      "On or about March 13, 2013, Serra Nissan sold, or attempted to sell, two vehicles to a customer named M.A.  At the time M.A. came to the Serra Nissan dealership, M.A. was in the early stages of dementia but was still able to drive. M.A. went to Serra Nissan with

two relatives and a family friend to have maintenance work done on M.A.'s car.  While at the dealership, Henderson asked them if M.A. was interested in trading-in her current car for a new car with 'zero down.'  M.A.'s relatives said they would be interested if the new car payment would not be any higher than M.A.'s current payment." (Doc. 1-9).

        b.    "M.A. told Henderson that she made $1,500 - $1,600 per month. However, when M.A.'s income was submitted to the lender, it said M.A. made $4,350 per month, instead of the number M.A. provided to Henderson." (*Id.*).

        c.    "M.A.'s relative, A.A., told Henderson that A.A. was also interested in purchasing a car.  However, when Henderson ran A.A.'s credit, Henderson determined that A.A. would not qualify for a car loan.  Later that day, after M.A. and her relatives had left the dealership, Henderson called A.A. and told her he had found a way to get A.A. a new car. Henderson told A.A. that he would work everything out in M.A.'s name and that A.A. just needed to come back to the dealership to fill out the paperwork.  After preparing the paperwork for A.A.'s car to be purchased in M.A.'s name, Henderson told A.A. that if the lender called, A.A. should not tell the lender that she actually drove the car.  Henderson also told A.A. not to go to the finance office with M.A. while M.A. was executing all of the paperwork for A.A.'s new car." (*Id.*).

      85.    **Customer J.T.** "On or about October 16, 2012, Serra Nissan sold a vehicle to a customer named J.T. During the car-buying process, J.T. submitted a bank statement to Serra Nissan, as requested by the finance manager, which only showed an ending account balance of $11.03.  Included in the information submitted by Serra Nissan to Capital One Auto Finance, a division of Capital One National Association and the financial institution that funded J.T.'s car loan, was a fraudulent BBVA Compass bank statement that J.T. had not provided to Serra Nissan. Green created the fraudulent bank statement and submitted it to Capital One Auto Finance without J.T.'s knowledge; the fake statement showed that J.T.'s monthly deposits totaled $6,179.95." (Doc. 1-7) (*See* Docs. 1-3 to 1-4).

      86.    **Customer W.K.**

a.    "On or about October 16, 2012, Serra Nissan sold a vehicle to a customer named W.K. Serra Nissan obtained vehicle financing for W.K. through Capital One Auto Finance." (Docs. 1-3 to 1-4, 1-7).  "Records received from Capital One Auto Finance included a similar fraudulent BBVA Compass bank statement as was submitted by Serra Nissan on behalf of J.T.," (Docs. 1-3 to 1-4), "that Green created and submitted on behalf of W.K., without W.K.'s knowledge," (Doc. 1-7).

b.    "W.K. did not provide any bank statements to the dealership; the only information W.K. provided to Serra Nissan for proof of income was W.K.'s social security letter. However, on the bank statement Green created and submitted to Capital One Auto Finance, it showed that each month, W.K received not only $1,555.00 in Social Security benefits, but also $2,973.00 in benefits from the Veterans Administration.  W.K., however, is not a veteran. Furthermore, W.K.'s Dealertrack credit application, submitted by Serra Nissan to obtain financing for W.K., also included false information that W.K. was retired from the State of Alabama and made $4,500 per month." (Docs. 1-3 to 1-4, 1-7).

87.    **Affirmative Acknowledgment of Fraud:** "Soon after J.T. and W.K. purchased their vehicles," Mughal and Shepard "attended a meeting" that included at least two sales managers and a salesman. (Docs. 1-3 to 1-4).  "During that meeting, both Mughal and" Shepard "instructed [the] Salesman [ ] that both deals, the W.K. and J.T. deals, could not go through because as is, the customers did not make enough money to obtain financing." (*Id.*).  "Mughal, referring specifically to the J.T. deal, told [the] Salesman [ ] that the deal could not be funded until they created a 'legal lie' for the bank that showed J.T. making $5,000 per month, rather than the actual amount J. T. stated to [the] Salesman [ ]." (*Id.*).  "Mughal and [Shepard told the] Salesman [ ] to go out and make the deal show that J.T. makes $5,000 per month, and then the deal can be funded." (*Id.*).  "Mughal and [Shepard] told [the] Salesman [ ] that if he could not make the paperwork showing the customers made enough money, the deal would have to be split with another salesman who could make the documents necessary to fund the deal." (*Id.*).

C.     **Criminal Charges Related to the Serra Enterprise after Plaintiffs' Complaint**

88.     After Plaintiffs' filed their Complaint, Randy Visser, a General Manager at Serra Nissan and co-owner of Serra Visser Nissan, and Kimberly Branch, Serra Nissan's Controller, either pleaded guilty to or was charged with a conspiracy to "pool" sales between the two motor vehicle dealerships.

**Randy Visser Plea Agreement**

89.     On June 5, 2015, the United States filed a plea agreement wherein Randy Visser agreed "to plead guilty to COUNT ONE of the Information [Conspiracy (18 U.S.C. § 371)] filed in" Case No. 2:15-cr-00167-LSC-TMP.  (Doc. 10-4).

90.     The factual basis for the plea regarding the conspiracy count is as follows:

a.     "The defendant, Randy D. Visser, was the General Manager at Serra Nissan, located at 1500 Center Point Parkway, Birmingham, Alabama 35215, in the Northern District of Alabama. As the General Manager at Serra Nissan during the relevant time period, Visser was responsible for overseeing sales and service, and was directly in charge of all marketing and advertising." (*Id.*).

b.     "Serra Nissan is co-owned by Randy D. Visser's wife, Kristina Serra Visser (who owns 50% of the dealership) and his father-in-law, Anthony Serra (who owns the other 50%). Serra Visser Nissan, however, is a car dealership in Cullman, Alabama, in the Northern District of Alabama, that, during the time frame set out in the information, was co-owned by Randy D. Visser (49%), Anthony Serra (49%), and Kristina Serra Visser (2%)." (*Id.*).

c.     "Serra Nissan and Serra Visser Nissan are franchises of Nissan North America, Inc. (hereafter, 'NNA'). NNA has many financial incentive programs it uses to reward dealerships who meet specified sales requirements. Often, each incentive is for a limited time period and has very specific requirements of which cars must be sold, and when. For example, the Dealer Volume Bonus was a 45-day program with general terms of volumes of cars to be sold. The time period for that incentive began on or around February 15, 2013, and ended on or about April 1, 2013. There was also a 'fast start objective' incentive program that lasted from on

or about February 15, 2013, until on or about February 28, 2013. If the dealer hit the specified sales targets during this period, they would receive an additional dollar amount per car sold." (*Id.*).

> d. "Each month, NNA sent dealers an incentive bulletin, roughly 36 pages long, that contains the rules for each incentive NNA has for the time period. The bulletin is sent to all Nissan dealerships. At the end of the bulletin, the audit process is described." (*Id.*).

> e. "As one of the terms of its incentive program, NNA prohibited a process known as 'pooling of sales.' If a dealer owned or was associated with more than one dealership, it could not combine sales or attribute sales from one dealership to another in order to meet sales incentives. For example, if the sales incentive goal was 25 cars sold in one month, and Serra Visser Nissan sold 30 and Serra Nissan sold 20, the dealerships were not allowed to represent that both had sold 25 in order to meet the incentive. This 'pooling of sales' would allow Serra Nissan to qualify for sales incentives it did not actually achieve, but for the misrepresentations of Serra Visser Nissan's sales as having occurred at Serra Nissan. Consequently, dealers were required to retail delivery report ('RDR') cars accurately, meaning, the dealer had to report where the car was actually sold." (*Id.*).

> f. "In or around March 2013, Serra Nissan determined that it was not going to meet its sales objectives in order to qualify for that month's incentives. Realizing this, Visser instructed F.H., Serra Nissan's Director of Operations, to do whatever necessary to ensure Serra Nissan achieved its sales objectives. At the time he gave the instruction, Visser knew that it would entail misrepresenting to Nissan North America, Inc. that cars sold at Serra Visser Nissan were sold at Serra Nissan when, in fact, they were not." (Doc. 10-4).

> g, "After giving this instruction, fifteen cars that were sold at Serra Visser Nissan in Cullman, Alabama, were reported to Nissan North America, Inc. as having been sold at Serra Nissan, in Birmingham, Alabama. As a result, Serra Nissan was able to meet its sales targets and qualify for incentives it was not entitled to, but for the false sales locations on the RDR." (*Id.*).

h.     "As part of the scheme, J.G., a sales manager at Serra Volkswagen, was instructed to create false documents showing the cars were sold at Serra Nissan, in the event Serra Nissan was audited by Nissan North America, Inc. K.B., the Controller of Serra Nissan, created a list of the fifteen relevant deals to be given to J.G. to make the false deal jackets." (*Id.*).

i.     "Visser provided the general direction for the scheme to submit false information on the RDRs to Nissan North America. The submission of that information caused wire communications to be transmitted in interstate commerce, to wit: between Serra Nissan in Alabama, and Nissan North America, Inc., in Tennessee." (*Id.*).

j.     "Visser and others did willfully conspire and combine to knowingly participate in a scheme to defraud Nissan North America, Inc., whereby they willfully submitted materially false information, with the specific intent to defraud Nissan North America, Inc., which caused wire communications to be transmitted in interstate commerce to help carry out the scheme to defraud." (*Id.*).

91.     Count One of the Information described the conspiracy:

a.     "From in or about March 2013 and continuing until in or about April 2013, the exact dates being unknown, in or around Jefferson County, within the Northern District of Alabama, and elsewhere, the defendant RANDY D. VISSER, did knowingly and willfully conspire, combine, and agree with other persons, known and unknown to the United States Attorney, to commit offenses against the United States, that is: to devise and intend to devise a scheme and artifice to defraud Nissan North America, Inc., to obtain money and property belonging to Nissan North America, Inc., by means of materially false and fraudulent pretenses, representations, and promises by use of interstate wire communications and transmissions, in violation of Title 18, United States Code, Section 1343."  Information, *U.S. v. Visser*, Case No.: 2:15-cr-00167-LSC-TMP (N.D. Ala. Jun. 5, 2015), Doc. 1.

## **Manner and Means of the Conspiracy**

b.       "It was a part of the conspiracy that defendant RANDY D. VISSER, and others both known and unknown to the United States Attorney, conspired to report vehicle sales made at Serra Visser Nissan as having been sold at Serra Nissan, for Serra Nissan to qualify for incentives to which it was not entitled." (*Id.*).

c.       It was a further part of the conspiracy that defendant RANDY D. VISSER, and others both known and unknown to the United States Attorney, falsified documents and created fake deal jackets to show that cars sold at Serra Visser Nissan had been sold at Serra Nissan, when, in fact, they had not. (*Id.*)

d.       It was a further part of the conspiracy that defendant RANDY D. VISSER, and others both known and unknown to the United States Attorney, would falsify the information submitted to Nissan North America, Inc., in the retail delivery report submitted for each car sale, to show that vehicles were sold at Serra Nissan when, in fact, they had been sold at Serra Visser Nissan." (*Id.*).

e.       "It was a further part of the conspiracy that defendant RANDY D. VISSER, and others both known and unknown to the United States Attorney, created false documents to avoid detection in the event that Nissan North America, Inc. conducted an audit on any of the sales." (*Id.*).

f.       "It was a further part of the conspiracy that defendant RANDY D. VISSER, and others both known and unknown to the United States Attorney, pooled sales between Serra Visser Nissan and Serra Nissan so that both dealerships would qualify for incentive payments from Nissan North America, Inc., when, in fact, Serra Nissan did not qualify without the falsely reported sales." (*Id.*).

## **Overt Acts**

g.       "In furtherance of the conspiracy and to achieve the objects thereof, defendant RANDY D. VISSER, and others both known and unknown to the United States Attorney, committed and caused to be committed the following overt acts, among others, in the

Northern District of Alabama and elsewhere[.]"  (*Id.* at 5).

   h. "In or around March 2013, RANDY D. VISSER instructed F.H., Executive Director of Serra Nissan, to do whatever was necessary to ensure that Serra Nissan hit its sales incentive goals for the month."  (*Id.*).

   i. "At the time RANDY D. VISSER instructed F.H. to 'get it done,' RANDY D. VISSER knew that request entailed taking car sales transactions from Serra Visser Nissan and representing to Nissan North America, Inc., that the cars were sold at Serra Nissan."  (*Id.* at 6).

   j. "As a result of RANDY D. VISSER's instruction to F.H., J.G. created false, duplicate deal jackets to make it look like fifteen vehicles had been sold at Serra Nissan, when, in fact, they had been sold at Serra Visser Nissan."  (*Id.*).

   j. "On or around June 1, 2013, RANDY D. VISSER, General Manager of Serra Nissan, emailed K.B. and F.H., to confirm whether the accounting was done properly when they logged the Serra Visser Nissan deals as having been sold at Serra Nissan."  (*Id.*).

   k. "On or around June 3, 2013, K.B. responded to RANDY D. VISSER and F.H., confirming that while she did not put the deals in accounting, she had a list of the fifteen deals so she could add the sales to any report. She also explained in the email that she had J.G. create fake Serra Nissan deal jackets in the event that Nissan North America, Inc. ever requested the deals be pulled."  (*Id.*).

   l. "All in violation of Title 18, United States Code, Section 371."  (*Id.*).

**Kimberly Branch Indictment and Conviction**

  92. Kimberly Branch was also indicted on one count of conspiracy (18 U.S.C. § 371) and fifteen counts of wire fraud (18 U.S.C. §§ 1343, 1349, and 2), and she was later convicted on the conspiracy count in connection with the "pooling" scheme detailed above.[12]

  93. The factual basis provided in the Branch Indictment is as follows:

---

[12] Kent Faulk, *Serra Nissan controller convicted of conspiracy to defraud carmaker; not guilty of wire fraud*, AL.com (last updated Aug. 14, 2015, 5:29 PM), http://www.al.com/news/birmingham/index.ssf/2015/08/serra_nissan_controller_convic.html

a.    "Serra Nissan is a car dealership, located at 1500 Center Point Parkway, Birmingham, Alabama 35215, in the Northern District of Alabama, that sells new and used cars." (Doc. 10-5).

b.    "Serra Nissan is co-owned by Tony Serra, who owns fifty percent of the dealership, and his daughter, Kristina Serra Visser, who owns the other fifty percent." (*Id.*).

c.    "Serra Visser Nissan is a car dealership located at 1645 2nd Avenue NW, Cullman, Alabama 35055, in the Northern District of Alabama, that also sells new and used cars." (*Id.*).

d.    "Serra Visser Nissan has three co-owners: Tony Serra (who owns forty nine percent), Randy Visser (Tony Serra's son-in-law, who owns forty nine percent), and Kristina Serra Visser (Tony Serra's daughter, who owns two percent)." (*Id.*).

e.    "Nissan Motor Company Ltd. is a Japanese multinational automobile manufacturer headquartered in Nishi-ku, Yokohama, Japan. Nissan North America, Inc. ('NNA'), was created to coordinate all of Nissan's various activities in North America and is headquartered in Franklin, Tennessee." (*Id.*).

f.    "NNA has many incentive programs it uses to reward dealerships who meet specified sales requirements. Often, each incentive is for a limited time period and has very specific requirements of which cars must be sold, and when." (*Id.*).

g.    "For example, the Dealer Volume Bonus was a 45-day program with general terms of volumes of cars to be sold. The time period for that incentive began on or around February 15, 2013, and ended on or about April 1, 2013. There was also a "fast start objective" incentive program that lasted from on or about February 15, 2013, until on or about February 28, 2013. If the dealer hit the specified sales targets during this period, they would receive an additional dollar amount per car sold." (Doc. 10-5).

h.    "Each month, NNA sent dealers an incentive bulletin, roughly 36 pages long, that contains the rules for each incentive NNA has for the time period. The bulletin is sent to all Nissan dealerships. At the end of the bulletin, the audit process is described." (*Id.*).

i.      "As one of the terms of its incentive program, NNA prohibited a process known as 'pooling of sales.' If a dealer owned or was associated with more than one dealership, it could not combine sales or attribute sales from one dealership to another in order to meet sales incentives. Dealers were required to retail delivery report ("RDR") cars accurately, meaning, the dealer had to report where the car was actually sold." (*Id.*).

j.      "At all times relevant, defendant KIMBERLY H. BRANCH was the Controller at Serra Nissan." (*Id.*).

94.     Count One of the Indictment described the conspiracy:

a.      "From in or about March 2013 and continuing until in or about April 2013, the exact dates being unknown, in or around Jefferson County, within the Northern District of Alabama, and elsewhere, the defendant KIMBERLY H. BRANCH, did knowingly and willfully conspire, combine, and agree with other persons, known and unknown to the Grand Jury, to commit offenses against the United States, that is: to devise and intend to devise a scheme and artifice to defraud NNA, to obtain money and property belonging to NNA, by means of materially false and fraudulent pretenses, representations, and promises by use of interstate wire communications and transmissions, in violation of Title 18, United States Code, Section 1343." (*Id.*).

## Manner and Means of the Conspiracy

b.      "It was a part of the conspiracy that defendant KIMBERLY H. BRANCH, and others both known and unknown to the Grand Jury, conspired to report vehicle sales made at Serra Visser Nissan as having been sold at Serra Nissan, for Serra Nissan to qualify for incentives to which it was not entitled." (Doc. 10-5).

c.      "It was a further part of the conspiracy that defendant KIMBERLY H. BRANCH, and others both known and unknown to the Grand Jury, falsified documents and created fake deal jackets to show that cars sold at Serra Visser Nissan had been sold at Serra Nissan, when, in fact, they had not." (*Id.*).

d.      "It was a further part of the conspiracy that defendant KIMBERLY H.

BRANCH, and others both known and unknown to the Grand Jury, would falsify the information submitted to NNA, in the retail delivery report submitted for each car sale, to show that vehicles were sold at Serra Nissan when, in fact, they had been sold at Serra Visser Nissan." (*Id.*).

e.      "It was a further part of the conspiracy that defendant KIMBERLY H. BRANCH, and others both known and unknown to the Grand Jury, created false documents to avoid detection in the event that NNA conducted an audit on any of the sales." (*Id.*).

f.      "It was a further part of the conspiracy that defendant KIMBERLY H. BRANCH, and others both known and unknown to the Grand Jury, pooled sales between Serra Visser Nissan and Serra Nissan so that both dealerships would qualify for incentive payments from NNA, when, in fact, Serra Nissan did not qualify without the falsely reported sales." (*Id.*).

**Overt Acts**

g.      "In furtherance of the conspiracy and to achieve the objects thereof, defendant KIMBERLY H. BRANCH, and others both known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in the Northern District of Alabama and elsewhere[.]" (Doc. 10-5).

h.      "In or around March 2013, KIMBERLY H. BRANCH brought the deal jackets for fifteen vehicle sales transactions, sold at Serra Visser Nissan, to J.G., a finance manager at Serra Nissan, for J.G. to create fake deal jackets showing the cars had been sold at Serra Nissan when, in fact, the cars had been sold at Serra Visser Nissan." (*Id.*).

i.      "At the request of KIMBERLY H. BRANCH, J.G. created false, duplicate deal jackets to make it look like the fifteen vehicles had been sold at Serra Nissan instead of Serra Visser Nissan." (*Id.*).

j.      "On or around June 1, 2013, R.V., General Manager of Serra Nissan, emailed KIMBERLY H. BRANCH and F.H., to confirm whether the accounting was done properly when they logged the Serra Visser Nissan deals as having been sold at Serra Nissan." (*Id.*).

k.      "On or around June 3, 2013, KIMBERLY H. BRANCH responded to R.V.

and F.H., confirming that while she did not put the deals in accounting, she had a list of the fifteen deals so she could add the sales to any report. She also explained in the email that she had J.G. create fake Serra Nissan deal jackets in the event that NNA ever requested the deals be pulled." (*Id.*).

l.      "All in violation of Title 18, United States Code, Section 371." (*Id.*).

**IV.    Plaintiffs' Dealings with the Serra Enterprise**

95.      In September of 2013, Plaintiff Henderson called Serra VW and was connected to Andy Taylor, a salesman with Serra VW.  Taylor requested Plaintiffs' identifying information, and Plaintiffs provided him with their social security information, proof of income, personal references, and other identifying information required by financial institutions in order to fund car loans.

96.      On or about September 16, 2013, Henderson e-mailed Plaintiffs' identifying information to Andy Taylor, including but not limited to an Alagasco bill, a reference sheet for Plaintiff Kemp, Kemp's social security number, and Kemp's pay stubs, which indicated an average weekly income of $318.50.  Henderson's only source of income was her VA disability compensation, which was approximately $250.00 per month.

97.      The following day, September 17, 2013, Taylor called Henderson to confirm receipt of Plaintiffs' identifying information.

98.      On Wednesday, September 18, 2013, Taylor contacted Henderson and asked if Plaintiffs wanted to test-drive a van at Serra VW.

99.      On Thursday, September 19, 2013, Taylor contacted Henderson again, indicating he had a car in which Plaintiffs would be interested; they arranged to meet and test-drive an automobile on Saturday, September 21, 2013, at Serra VW.

100.      Henderson then believed that Plaintiffs had been approved for financing because they had provided their identifying information to Taylor and because Taylor continued to contact Plaintiffs urging them to purchase an automobile.

101.      Plaintiffs arrived at Serra VW on Saturday, September 21, 2013, and met with

Taylor.  During the meeting, Taylor told Plaintiffs he was working with Patrick Donlevy, who was a manager with Serra Nissan, on their deal.

102.    Shortly thereafter, Donlevy pulled up on the Serra VW lot with a 2011 Toyota Corolla for Plaintiffs to test-drive.  Plaintiffs then test drove the Corolla, accompanied by Taylor.

103.    After the test drive, Plaintiffs and Taylor pulled into the Serra Nissan lot, and Plaintiffs were immediately taken to Donlevy's office to sign the closing paperwork.  The closing paperwork was completely filled out when Plaintiffs entered Donlevy's office, including the financing, RISC, and all other paperwork Plaintiffs signed at the closing.

104.    Donlevy told Plaintiffs the monthly payment would be $430.59 per month, which was the only financial disclosure Plaintiffs received before signing the closing documents.  Also, Donlevy falsely told Plaintiffs they could refinance the Corolla after making payments for a year to lower the monthly payment.

105.    After Plaintiffs executed the closing documents, Donlevy informed Plaintiffs that Capital One, the financing company, would contact them asking about the accessories on their Corolla.  He further instructed them to tell Capital One the Corolla had leather seats, a navigation system, and a Bose sound system.

106.    Plaintiffs left Serra Nissan that day without their Corolla.  They received a loaner car until the following Monday.

107.    Approximately five (5) to seven (7) days after Plaintiffs executed the closing documents, they received a call from Capital One asking about the features on their Corolla.  Specifically, Capital One inquired about whether the Corolla had leather seats, a navigation system, and a Bose sound system.

108.    Henderson then contacted Taylor to inquire about the leather seats, navigation system, and the Bose sound system.  Even though the Corolla did not have leather seats, a navigation system, or a Bose sound system, Taylor fraudulently represented that the Corolla did have all these features.

109.    Regarding the leather seats, Taylor falsely informed Henderson the seats were not

41

basic cloth seats.  He insisted that while the seats were not technically leather, they were a special, upgraded material that the financial institutions consider leather.

110.   Even though the Corolla does not have leather seats, a navigation system, or a Bose sound system, Taylor further instructed Henderson to tell Capital One that the Corolla had leather seats, a navigation system, and a Bose sound system because, according to Taylor, the Corolla contained those features.  Trusting Taylor and his representations, Henderson told Capital One that the Corolla did contain leather seats, a navigation system, and a Bose sound system.

111.   Capital One called again to verify the Corolla's VIN and mileage, which Henderson provided.  She then contacted Donlevy; he responded that it was merely a problem with the paperwork and that he had already remedied the issue concerning the VIN and mileage.

112.   Shortly thereafter, two Internal Revenue Service criminal investigation special agents contacted Plaintiffs.  The IRS agents presented Plaintiffs with paperwork and documents showing that a member or members of the enterprise had altered Plaintiffs' identifying information that was submitted to financial institutions.  Thus, Defendants and/or members of the Serra Enterprise, with the intent to defraud for their benefit and without Plaintiffs' authorization, consent, or permission of the victim, obtained financing through the use of Plaintiffs' identifying information.

113.   The IRS agents also informed Plaintiffs that members of the enterprise had listed features of the Corolla that were not actually included on the automobile—leather seats, a navigation system, and a Bose sound system—despite the affirmative representations by Donlevy and Taylor that the Corolla had these features.

114.   In addition to fraudulently altering Plaintiffs' identifying information, fraudulently inflating their income, and "power booking," members of the enterprise also defrauded Plaintiffs by quoting them an inflated monthly payment on the Corolla, so that a Vehicle Service Contract and Gap Contract could be added at the end of the transaction without Plaintiffs realizing they were paying for them.

115.    Plaintiffs' identifying information, closing documents and/or other information or documents relating to Plaintiffs' purchase were sent or received by Defendants in interstate commerce by U.S. mail, commercial carrier, wire, or other interstate electronic media in September 2013 as alleged in this Complaint.

116.    When Plaintiffs' loan was financed on or about September 21, 2013, the funds from the loan were transmitted by wire across state lines from Capital One, a federally-insured financial institution, directly to Defendants and/or members of the enterprise. From these funds, the dealerships, employees, and associates in the deal, including Taylor and Donlevy, were paid their commission.

117.    They also received an additional amount on top of their normal commission because they submitted fraudulent documents to obtain Plaintiffs' loan, "power booked," and "packed" the loan with unwanted add-ons. (*See generally* Docs. 1-3, 1-4).

118.    On or about September 21, 2013, after Plaintiffs purchased the Corolla, Defendants sent or caused to be sent in interstate commerce the financing required documents by the U.S. mail or commercial interstate carrier.

119.    Plaintiffs' documentation shows that the purchase price on the Bill of Sale was inflated to include a Vehicle Service Contract, and a Gap Contract was also added to Plaintiffs RISC without their knowledge. (Plaintiffs' Retail Installment Sales Contract, Doc. 1-14); (Retail Order, Doc. 1-15); (Bill of Sale, Doc. 1-16).  Specifically, Plaintiffs were not aware they had purchased a Vehicle Service Contract or Gap Contract as an add-on until well after they signed the closing paperwork.

120.    A comparison of the Retail Order and Bill of Sale demonstrates how the purchase price was fraudulently inflated to include a Vehicle Service Contract, presumably through listing accessories not actually included on the Corolla so Capital One would increase its loan amount:

|  | Retail Order | Bill of Sale | Difference |
|---|---|---|---|
| Total Selling Price | $15,399.00 | $17,194.00 | $1,795.00 |
| Trade-in Allowance | ($2,000.00) | ($2,000.00) | $0.00 |
| Net Difference | $13,399.00 | $15,194.00 | $1,795.00 |
| Documentary Fee | $699.10 | $699.10 | $0.00 |
| Taxable Selling Price[13] | $14,098.10 | $15,893.10 | $1,795.00 |
| Ala. Sales Tax | $669.66 | $669.66 | $0.00 |
| Title Fee | $16.50 | $16.50 | $0.00 |
| Unpaid Balance Due | $14,784.26 | $16,579.26 | $1,795.00 |

(Docs. 1-15, 1-16). The Total Selling Price, Net Difference, and Taxable Selling Price reflected on the Bill of Sale is $1,795.00—the exact price of the Vehicle Service Contract—more than the same prices on the Retail Order. (*Compare* Doc. 1-15, *with* Doc. 1-16); (*see also* Doc. 1-14) (showing the Vehicle Service Contract price).

121.   This practice is further confirmed by the amount of sales tax charged. Alabama sales tax is 4.75%[14] of the Taxable Selling Price. Both the Retail Order and Bill of Sale list the sales tax as $669.66—4.75% of the Taxable Selling Price listed on the Retail Order. Therefore, despite the Taxable Selling Price increasing by $1,795.00 on the Bill of Sale, the sales tax charged and paid is based on the $14,098.10 Taxable Selling Price listed on the Retail Order—the actual price of the Corolla.

122.   Plaintiffs did not sign either the Retail Order or Bill of Sale, and the Retail Order is the only document containing an arbitration agreement. Both the Retail Order and Bill of Sale are signed only by Donlevy.

123.   Plaintiffs also financed a Gap Contract without their knowledge. By informing Plaintiffs only of the inflated monthly payment for the Corolla, retaining control of the closing

---

[13] The Taxable Selling Price (i.e., the portion of the sale subject to Alabama State, county and city taxes) is the Total Selling Price less the Trade-in allowance (or down payment) plus the documentary fee.
[14] State sales tax is 2.00% of the Taxable Selling Price; County sales tax is 0.75% of the Taxable Selling Price; and City sales tax is 2.00% of the Taxable Selling Price.

documents, and denying Plaintiffs any meaningful opportunity to review them, Donlevy and Taylor were able to add a Vehicle Service Contract and Gap Contract at the end of the transaction without Plaintiffs realizing they were paying for them.

124.    Despite the fact that Plaintiffs dealt with Taylor and Serra VW for every aspect of their transaction except for signing the closing documents, the documents list Serra Nissan as the seller but both Taylor, a salesman with Serra VW, and Donlevy, a finance manager at Serra Nissan, as the salespersons on the deal.  This demonstrates that Serra VW, Serra Nissan, and all their employees and associates knew of and were complicit in the Serra Enterprise's fraudulent scheme.

125.    Accordingly, members of the Serra Enterprise, including Donlevy and Taylor, at the direction of Defendants, with their participation, or with their full knowledge, approval, among other things:

a.    fraudulently inflated Plaintiffs' income information submitted to financial institutions to show an artificially high income to obtain a loan for which Plaintiffs otherwise would not qualify;

b.    fraudulently altered Plaintiffs' identifying information and funding required documents that were sent or received by postal service, commercial carrier, wire, or other interstate electronic media;

c.    fraudulently inflated the value of the Corolla by falsifying information regarding the features that were actually on Plaintiffs' Corolla; and

d.    fraudulently quoted Plaintiffs an inflated monthly payment to add a Vehicle Service Contract and Gap Contract at the end of the transaction without Plaintiffs realizing they were paying for them.

126.    As a direct and proximate result of Defendants' fraudulent conduct as alleged in this Complaint, Plaintiffs were injured in their business and property.

127.    Defendants Serra Nissan, Serra VW, Serra Automotive Management, and/or Tony Serra also retained investigators to contact Plaintiffs and Class Members to further carry out and

conceal Serra Enterprise's fraudulent scheme.  On behalf of Defendants, two investigators from A to Z Confidential Investigations, Robert M. Callahan and John Taylor, visited Plaintiffs in-person and uninvited by means of false pretenses, representations, promises, or omissions. (*See* A to Z Confidential Investigations business cards and information given to Plaintiffs, Doc. 1-17).

128.    Specifically, the investigators falsely represented they received Plaintiffs' information from the IRS agents discussed above.  Plaintiffs thereafter contacted the IRS agents, and were informed investigators' representations were false—the IRS neither provided Plaintiffs' information to any third-party, including the investigators, nor caused the investigators to contact Plaintiffs.  Instead, the investigators received Plaintiffs' information from Defendants.

129.    The investigators also misrepresented they were there only for the purpose of "gathering information," giving Plaintiffs the false impression the investigators were there to help them.  The investigators, however, visited Plaintiffs to convince them that Taylor and Donlevy, not the dealerships, were solely responsible for the fraudulent conduct in their purchase of the Corolla, and any legal action should be pursued against Taylor and Donlevy.

130.    The investigators further asked Plaintiffs if they could "write something up" for them to sign.  After the investigators left, they later called Plaintiffs and against asked if they could "write something up" for Plaintiffs to sign.  Plaintiffs declined on both occasions.

131.    A to Z Confidential Investigations, Inc., Robert Callahan, and John Taylor, are not the employee of any Defendant in the ordinary sense, but have engaged and continue to engage in a course of business dealing on behalf of Defendants Serra Nissan, Serra VW, Serra Automotive Management and/or Tony Serra to further carry out and conceal the Serra Enterprise's fraudulent scheme by contacting Plaintiffs and Class Members for the purpose of negotiating, drafting, and securing a written release of their legal rights against Defendants Serra Nissan, Serra VW, Serra Automotive Management and/or Tony Serra through false pretenses, representations, promises, or omissions.

**V.      Racketeering Activity (Predicate Acts)**

132.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 1344 (relating to financial institution fraud), and 18 U.S.C. §§ 1028 and 1028A (relating to identity fraud).

**A.      Mail and Wire Fraud**

133.     As alleged more specifically in this Complaint, for the purpose of executing and/or attempting to execute the scheme to defraud or obtain money by means of false pretenses, representations, promises, or omissions, beginning at least as early as August 2010, Defendants and members of the enterprise have, in violation of 18 U.S.C. § 1341, directed or caused matter or things to be sent or received via the U.S. mail or commercial interstate carriers.

134.     Defendants further conspired to commit and aided and abetted each act of mail fraud carried out by members of the enterprise, as alleged in this Complaint.

135.     As alleged more specifically in this Complaint, for the purpose of executing and/or attempting to execute the scheme to defraud or obtain money by means of false pretenses, representations, promises, or omissions, beginning at least as early as August 2010, Defendants and members of the enterprise have, in violation of 18 U.S.C. § 1343, directed or caused matter or things to be transmitted or received by wire or other interstate electronic media, including without limitation the submission of materially false information to financial institutions and the receipt of funds from lending institutions.

136.     Defendants further conspired to commit and aided and abetted each act of wire fraud carried out by members of the enterprise, as alleged in this Complaint.

137.     The matter and things sent or received by Defendants and/or members of the enterprise through the U.S. mail, interstate commercial carrier, wire or other interstate electronic media include without limitation:

        a.      using mail and/or wire communications to contact customers;

        b.      using mail and/or wire communications to obtain identifying information from customers;

        b.      using the mail and/or wire communications to "coach" customers;

        c.      using the mail and/or wire communications to send or receive customers' identifying information;

        d.      using the mail and/or wire communications to send or receive credit applications;

        e.      using the mail and/or wires to receive funds from lending institutions;

        f.      using the mail and/or wire communications to send the executed funding required documents to lending institutions; and/or

        g.      using the mail and/or wire communications for other matter and things with knowledge and approval of Defendants and members of the enterprise, which included information or communications in furtherance of or necessary to effectuate the Serra Enterprise's fraudulent scheme.

138.    The false or fraudulent pretenses, representations, promises, or omissions made by Defendants and members of the enterprise were made knowingly and willfully, at the direction of Defendants, with their participation, or with their full knowledge, approval, and ratification, and for the purpose of deceiving Plaintiffs and Class Members and obtaining their property for Defendants' gain.

139.    Plaintiffs and Class Members have been injured in their money and property by Defendants' scheme to defraud them and use of the U.S. mail, interstate commercial carrier, wire or other interstate electronic media which is an essential part of Defendants' scheme.  As a result, Defendants have obtained money and property belonging to Plaintiffs and Class Members, and Plaintiffs and the Class Members have been injured in their business or property by the Defendants' overt acts of mail and wire fraud, by their conspiracy, and by their aiding and abetting each act of mail and wire fraud.

### B.    Bank Fraud

140.    As alleged more specifically in this Complaint, for the purpose of executing and/or attempting to execute the scheme to defraud or obtain money by means of false pretenses, representations, promises, or omissions, Defendants and members of the enterprise have, in violation of 18 U.S.C. § 1344, beginning at least as early as August 2010, knowingly executed or attempted to execute a scheme to defraud federally-insured financial institutions and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of financial institutions.

141.    Defendants further conspired to commit and aided and abetted each act of bank fraud carried out by members of the enterprise, as alleged in this Complaint.

142.    The false and fraudulent pretenses, representations, promises, or omissions made by Defendants and members of the enterprise were made knowingly and willfully, with Defendants' full knowledge, approval and ratification, and for the purpose of deceiving financial institutions, Plaintiffs, and Class Members to obtain their property for Defendants' gain.

143.    Plaintiffs and Class Members have been injured in their money and property by Defendants' scheme to defraud them, and bank fraud is an essential part of Defendants' scheme. As a result, Defendants have obtained money and property belonging to Plaintiffs and Class Members, and Plaintiffs and Class Members have been injured in their business or property by the Defendants' overt acts of bank fraud, by their conspiracy, and by their aiding and abetting each act of bank fraud.

### C.    Identity Fraud

144.    As alleged more specifically in this Complaint, for the purpose of executing and/or attempting to execute the scheme to defraud or obtain money by means of false pretenses, representations, promises, or omissions, Defendants and members of the enterprise have, in violation of 18 U.S.C. §§ 1028 and 1028A, beginning at least as early as August 2010, knowingly transferred, possessed and used, without lawful authority, government-issued personal "identification documents" (as defined in 18 U.S.C. § 1028(d)), knowing that the

identification documents constituted a means of identification of an actual person, during and relating to the mail fraud, wire fraud, and bank fraud.

145.    Defendants further conspired to commit and aided and abetted each act of identity fraud carried out by members of the enterprise, as alleged in this Complaint.

146.    The false and fraudulent pretenses, representations, promises, or omissions made by Defendants and members of the enterprise were made knowingly and willfully, with Defendants' full knowledge, approval and ratification, and for the purpose of deceiving financial institutions, Plaintiffs, Class Members to obtain their property for Defendants' gain.

147.    Plaintiffs and Class Members have been injured in their money and property by Defendants' scheme to defraud them and identity fraud is an essential part of Defendants' scheme.  As a result, Defendants have obtained money and property belonging to Plaintiffs and Class Members, and Plaintiffs and Class Members have been injured in their business or property by the Defendants' overt acts of identity fraud, by their conspiracy, and by their aiding and abetting each act of identity fraud by Defendants and members of the enterprise.

## VI.    The Pattern of Racketeering Activity

148.    Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by knowingly and willfully committing, conspiring to commit, and aiding and abetting the commission of at least two acts of racketeering activity—indictable violations of 18 U.S.C. §§ 1341, 1343, 1344, 1028, and 1028A—within the past ten years.  These predicate acts constitute a pattern of racketeering through which Defendants and members of the enterprise violated 18 U.S.C. §§ 1962(c) and (d).

149.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Plaintiffs and Class Members.  Defendants and members of the enterprise have treated Plaintiffs and Class Members in the same illegal manner alleged in this Complaint.

150.    As set forth in this Complaint, Defendants and members of the Serra Enterprise have engaged in a series of related predicate acts over a substantial period of time.

151.    The predicate acts alleged in this Complaint are the Serra Enterprise's regular way of doing business for customers that do not qualify for car loans and establish a threat of continued racketeering activity projecting into the future, presenting the type of ongoing unlawful activities whose scope and persistence pose a special threat to consumers. (*See*, *e.g.*, Ex. K) (explaining Green "and others known and unknown to the United States Attorney, were instructed by management, as a policy and practice at the dealership, to shred original credit applications filled out by certain customers so there was no record of the customer's actual income.").

152.    Not all of the Serra Enterprise are known, and not all known members of the Serra Enterprise have been indicted.  Serra Enterprise's fraudulent scheme is also self-containing by its very nature.  As demonstrated by the deals involving J.T., W.K., and Plaintiffs, Defendants and members of the enterprise are able to carry out their fraudulent scheme without a customer's knowledge.

153.    As supported by criminal charges, indictments, and plea agreements, the illegal conduct alleged in this Complaint is the Serra Enterprise's regular way of doing business. Further, Defendants and members of the enterprise continue to engage in a course of business dealing to further carry out and conceal the Serra Enterprise's fraudulent scheme by contacting Plaintiffs and Class Members for the purpose of negotiating, drafting, and securing a written release of Plaintiffs' legal rights against Defendants Serra Nissan, Serra VW, Serra Automotive Management and/or Tony Serra through false pretenses, representations, promises, or omissions.

154.    Plaintiffs and Class Members will suffer an irreparable injury if A to Z Confidential Investigations, Inc. are allowed to continue contacting them for the purpose of negotiating, drafting, and securing a written release of Plaintiffs' legal rights against Defendants Serra Nissan, Serra VW, Serra Automotive Management, and/or Tony Serra through false pretenses, representations, promises, or omissions.

## COUNT I
### (RICO Violation—18 U.S.C. § 1962(c))

155.    Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

156.    Serra Enterprise is an enterprise engaged in and whose activities affect interstate commerce.  Defendants Serra Nissan, Serra VW, Serra Automotive Management, and Tony Serra are employed by or associated with the enterprise.

157.    As alleged in this Complaint, pursuant to and in furtherance of the Serra Enterprise's fraudulent scheme, Defendants committed multiple related acts of mail fraud, wire fraud, bank fraud, and identity fraud.

158.    As alleged in this Complaint, pursuant to and in furtherance of the Serra Enterprise's fraudulent scheme, members of the Serra Enterprise committed multiple related acts of mail fraud, wire fraud, bank fraud, and identity fraud at the direction of Defendants, with their participation or with Defendants' full knowledge, approval, and ratification.

159.    The acts alleged in this Complaint constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).  In violation of 18 U.S.C. § 1962(c), Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the Serra Enterprise through a pattern of racketeering activity described above.

160.    As a direct and proximate result of Defendants' pattern of racketeering activity and violations of 18 U.S.C. § 1962(c), Plaintiffs and Class Members have been injured in their business or property in that, among other things, they paid for features not on the vehicle, paid a fraudulently inflated purchase price, were indebted by fraudulent means, and/or paid for additional add-on products that were fraudulently packed into their loans without their knowledge.

## COUNT II
### (RICO Violation—18 U.S.C. § 1962(d))

161.    Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

162.    As alleged in this Complaint, Defendants Serra Nissan, Serra VW, Serra Automotive Management, Tony Serra, and members of the Serra Enterprise agreed and

conspired to conduct and participate in the conduct of the affairs of the Serra Enterprise through a pattern of racketeering activity.

163.    Defendants Serra Nissan, Serra VW, Serra Automotive Management, Tony Serra, and members of the Serra Enterprise have engaged in the illegal conduct mentioned above as part of a common scheme or conspiracy.  This conspiracy could not have been achieved effectively without the willful direction and participation, or knowledge, approval, and ratification, of Defendants.

164.    Defendants Serra Nissan, Serra VW, Serra Automotive Management, and Tony Serra have, with knowledge and intent, conspired and agreed to conduct and participate in the Serra Enterprise through a pattern of racketeering activity.  Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the fraudulent scheme alleged in this Complaint.

165.    Defendants have, therefore, conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

166.    Moreover, for the fraudulent scheme to be successful, Defendants and members of the Serra Enterprise had to agree to enact and utilize the same devices and fraudulent tactics against Plaintiffs and Class Members.

167.    As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and Class Members have been injured in their business or property in that, among other things, they paid for features not on the vehicle, paid a fraudulently inflated purchase price, were indebted by fraudulent means, and/or paid for additional add-on products that were fraudulently packed into their loans without their knowledge.

## COUNT III
### (Aiding and Abetting a Violation of RICO (18 U.S.C. § 2))

168.   Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

169.   Defendants and members of the enterprise knowingly, and with shared intent, sought to, and have aided and abetted each of the other members of the enterprise in the commission of the predicate acts and pattern of racketeering activity in violation of the RICO count, above.

170.   As a result, under 18 U.S.C. § 2, the RICO violations of each member of the enterprise are those of the others as if they had been committed directly by them.

171.   As a direct and proximate result of the fact that each member of the enterprise aided and abetted the others in violating the sections of RICO described above, Plaintiffs and Class Members have been injured in their business and property by the predicate acts which make up Defendants and members of the enterprise's pattern of racketeering activity.

172.   Specifically, Plaintiffs and Class Members have been injured in their business or property in that, among other things, they paid for features not on the vehicle, paid a fraudulently inflated purchase price, were indebted by fraudulent means, and/or paid for additional add-on products that were fraudulently packed into their loans without their knowledge.  Defendants are therefore liable for the RICO violations committed by other members of the enterprise as if Defendants had committed them directly.

## COUNT IV
### (Identity Theft)

173.   Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

174.   Alabama's "Consumer Identity Protection Act" is codified at Ala. Code § 13A-8-190 *et seq.* This Act, found in the Alabama Criminal Code, provides for criminal and civil remedy where a person's identifying information is used to violate the Act.

175.   Ala. Code § 13A-8-191(2) defines "identifying information" as "[a]ny information, used either alone or in conjunction with other information, that specifically

identifies a person or a person's property," which includes, but is not limited to, a person's: name, social security number, financial services account numbers, and "[a]ny other numbers or information that can be used to access a person's financial resources, obtain identification, act as identification, or obtain goods or services."

176.    Ala. Code § 13A-8-191(1) defines "identification documents" as "[a]ny papers, cards, or other documents issued by federal, state, or local governmental authorities that are used specifically to identify a person," which includes, but is not limited to "driver's licenses, military identification cards, passports, birth certificates, Social Security cards, and other government-issued identification cards."

177.    Ala. Code § 13A-8-191 (3) defines a "victim" as any "person whose identification documents or identifying information are used to" violate the Act.

178.    Ala. Code § 13A-8-192 provides, in part, that a person violates the Act if, without the authorization, consent, or permission of the victim, and with the intent to defraud for his or her own benefit or the benefit of a third person, he or she does any of the following:

(1)  Obtains, records, or accesses identifying information that would assist in accessing financial resources, obtaining identification documents, or obtaining benefits of the victim.

(2)  Obtains goods or services through the use of identifying information of the victim.

(3)  Obtains identification documents in the victim's name.

179.    Ala. Code § 13A-8-199 provides a civil remedy for violations of Section 13A-8-192, in addition to other remedies provided by law, under which the "victim" may recover the greater of $5,000.00 or three times actual damages for each incident, plus attorney's fees and court costs.

180.    Plaintiffs and Class Members are "victims" as defined under the Consumer Identity Protection Act.

181.    Defendants and/or members of the enterprise used Plaintiffs' and Class Members' identifying information in such a way as to have violated Section 13A-8-192 of the Act.

182.    Defendants and/or members of the enterprise used Plaintiffs' and Class Members'

identifying information without permission, with intent, for their own profit, for the purpose of defrauding the Plaintiffs and Class Members, all in such a way as to have violated Section 13A-8-192 of the Act.

183.    Defendants and/or members of the enterprise are liable to Plaintiffs and Class Members under the Consumer Identity Protection Act for all remedies available under the Act.

## COUNT V
### (Unjust Enrichment)

184.    Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

185.    Defendants have received a benefit at the expense of Plaintiffs and Class Members by providing loans to customers with credit problems or insufficient income for which they would not have been approved without the Serra Enterprise's fraudulent scheme.

186.    Defendants intended to and have benefited from the fraudulent scheme by, among other things, selling vehicles to buyers that otherwise would not have been approved for such vehicles, increasing profits from fraudulently inflated sales prices, and receiving additional profits by packing loans to incorporate the cost of additional products—such as a vehicle service contract, warranty, or gap contract—all without the buyer's knowledge.

187.    It is unjust and inequitable to permit Defendants to retain the benefits they have obtained through their scheme to defraud by means of false pretenses, representations or promises.  The financial benefits obtained by Defendants should not, in fairness, be retained by them but rather should be paid and returned to Plaintiffs and Class Members.

188.    As a direct and proximate result of the inequitable conduct by Defendants and members of the enterprise, Plaintiffs and Class Members suffered pecuniary loss, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT VI
### (Fraudulent Concealment)

189.    Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

190.    When purchasing an automobile, buyers such as Plaintiffs and Class Members

trusted Defendants and members of the enterprise to provide truthful information during the financing process and to honestly handle their vehicle financing.

191.    As a routine practice of the Serra Enterprise, Defendants, and members of the enterprise at the direction of Defendants with their participation, or with their full knowledge, approval, and ratification, would tell the buyer what the monthly payment on the automobile would be without providing any other meaningful financial disclosure(s); if the buyer appeared hesitant, Defendants and members of the enterprise would falsely tell the purchaser they could refinance the automobile, and lower the monthly payment, after making payments for a short period of time.

192.    As a routine practice of the Serra Enterprise, Defendants and members of the enterprise would retain control of each sheet of paper when a buyer was signing the closing documents, exposing only the signature lines and telling the buyer only where to sign or initial— initial here, initial there; sign here, sign there.  Additionally, Defendants and members of the enterprise would not provide the closing documents for buyers to review prior to or during their execution.  Buyers were therefore denied any meaningful opportunity to read the closing documents and prevented from reviewing or understanding what they were actually financing and prevented from understanding the total amount they will have paid after making all scheduled payments.

193.    In the process of arranging financing and executing closing documents, Plaintiffs and Class Members were harmed when Defendants and members of the enterprise hid or withheld important facts from them, including without limitation that Defendants and members of the enterprise fraudulently obtained the loan, inflated the loan amount, quoted an inflated monthly payment, and/or "packed" the loan with the cost of add-on products—such as a vehicle service contract, warranty, or gap contract.

194.    Defendants and members of the enterprise have a duty to disclose these facts to Plaintiffs and Class Members.  All members of the enterprise are automobile dealers or employees of dealers and engage in loan financing on a regular basis in the course of their

business.  There is an inherent disparity of knowledge between the customer and Defendants and members of the enterprise.

195.   The facts withheld by Defendants and members of the enterprise were material to Plaintiffs and Class Members.  Reasonable consumers, including Plaintiffs and Class Members, would not have executed the closing documents had they known that Defendants and members of the enterprise had withheld these facts.

196.   Defendants and members of the enterprise withheld these material facts to induce Plaintiffs and Class Members to execute their closing documents, and they did execute these documents without knowledge of these material facts.

197.   As a direct and proximate result of the fraudulent concealment by Defendants and members of the enterprise, Plaintiffs and Classes Members purchased vehicles from Defendants and suffered pecuniary loss, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT VII
### (Negligence, Wantonness, and/or Reckless Conduct)

198.   Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

199.   Defendants and members of the enterprise owed Plaintiffs and Class Members a duty not to be wanton, negligent, and/or reckless in their conduct toward Plaintiffs and Class Members, including but not limited to, the following conduct: (1) creating false documents and/or materially altering documents; (2) obtaining financing-related documents by fraudulent means; (3) charging and financing an inaccurate and fraudulently inflated loan amount and sales price; (4) quoting a fraudulently inflated monthly payment; (5) "packing" transactions with the cost of add-on products, such as a vehicle service contract, warranty, or gap contract; (6) making material misrepresentations and communications to third parties regarding Plaintiffs' and Class Members' financial abilities and identifying information, knowing that Plaintiffs and Class Members would be harmed by the third parties' reliance on such misrepresentations; and/or (7) engaging in other conduct inconsistent with Defendants' obligations and duties under the

contract, federal and state law.

200.     Defendants and members of the enterprise breached their duty.  Defendants were willful, wanton, negligent, and/or reckless in its use of Plaintiffs' and Class Members' personal and identifying information, including the theft and misuse of Plaintiffs' and Class Members' identity, intentionally and knowingly false, misleading and deceptive information regarding Plaintiffs and Class Members, to facilitate the lease/sale of a vehicle to them and to facilitate the lease/sale of the falsified financing contracts to third parties to maximize profits for Defendants and the enterprise.

201.     Defendants were negligent, wanton, and/or reckless in their conduct regarding Plaintiffs and Class Members in that Defendants caused damages to Plaintiffs and Class Members.  Defendants also knew or should have known that Plaintiffs and Class Members would foreseeably suffer injury as a result of Defendants' failure negligent, wanton, and/or reckless conduct alleged herein.

202.     As a direct and proximate result of the negligent, wanton, and/or reckless conduct by Defendants and members of the enterprise, Plaintiffs and Class Members suffered pecuniary loss, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT VIII
### (Negligent Training, Supervision, and/or Retention)

203.     Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

204.     Defendants and members of the enterprise owed Plaintiffs and Class Members a duty of care and professionalism in the rendition of the services rendered and products sold to Plaintiffs and Class Members; in training and supervising members of the enterprise and/or employees to perform those services in full compliance with the laws of the State of Alabama and the Federal Government; in not engaging or allowing members of the enterprise or Defendants' agents to engage in the wrongful practices herein alleged; in not suppressing or concealing such activities or enabling members of the enterprise, employees, and/or agents to do

so; and in not terminating or otherwise disciplining those members of the enterprise, employees, and/or agents known to have violated company policies and state and federal laws or regulations by engaging in the misconduct herein alleged.

205.     Defendants and members of the enterprise owed duties to Plaintiffs and Class Members in putting forth loyal, honest, and fair dealing employees or agents who act in compliance with Federal and State laws regarding the sale, titling and financing of vehicles, as well as the proper methods utilized for credit inquiry and Defendants' and the enterprise's superior knowledge of those respective industries, its practices, and Defendants' and the enterprise's practices.  Defendants' and the enterprise's negligent retention of employees known to have engaged in the misconduct described herein acted as ratification of such misconduct and resulted in the aiding and abetting of unlawful conduct.

206.     The Defendants each, working collectively or as agents, breached the duties they owed to Plaintiffs and Class Members, and such breaches arise out of the negligent or wanton conduct of the Defendants and those who acted in concert or conspiracy with them or acted as their agents, servants or employees, and in the line and scope of their business, contractual, and/or statutory and regulatory duties, in order to preserve and protect the financial interest of the Defendants and those who acted in concert or conspiracy with them.

207.     Defendants knew, or should have known, of the wrongful or fraudulent practices engaged in by members of the enterprise, employees, and/or agents, and knew or should have known that their own training, supervision, and/or retention practices were inadequate to fulfill their obligation to protect the public, Plaintiffs, and Class Members.  Defendants knew, or should have known, that their policies and practices in training, supervising, and retaining such members of the enterprise, employees, and/or agents were inadequate to prevent or detect the misconduct described herein, and such inadequate policies and practices were the actual and proximate cause of Plaintiffs' and Class Members' injuries.

208.     Plaintiffs and Class Members have incurred damages proximately caused by Defendants' negligence in training, supervising, and retaining its employees and/or agents.

209.    By their conduct, Defendants breached said duties to Plaintiff and Class Members, and were wanton, negligent, and/or reckless.

210.    As a proximate result of the aforementioned conduct of Defendants, Plaintiffs and Class Members suffered pecuniary loss as described above in an amount to be proven at trial, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT IX
### (Civil Conspiracy)

211.    Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

212.    Defendants and members of the enterprise willfully, knowingly, and intentionally agreed and conspired with each other for the purpose of engaging in unlawful conduct, for unlawful purposes, including without limitation acts of fraud as alleged in this Complaint, the furtherance of their schemes, and for the purpose of engaging in otherwise lawful conduct by wrongful conduct and means.

213.    Defendants and members of the enterprise committed the acts alleged pursuant to, and in furtherance of, that agreement and furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of the others.

214.    As a direct and proximate result of the acts in furtherance of the conspiracy, Plaintiffs and Class Members have suffered injury, damage, loss, and harm as described above. The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing this harm.

215.    Defendants and members of the enterprise's intentional agreements to commit, and the commission of, these wrongful acts was willful, malicious, oppressive, and in wanton and conscious disregard of Plaintiffs' and Class Members' rights.  Plaintiffs and Class Members are entitled to an award of punitive damages to punish Defendants' wrongful conduct and to deter future wrongful conduct.  As a result, Plaintiffs and Class Members have been damaged as described above in an amount to be proven at trial.

## Count X
### (Aiding and Abetting)

216.    Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

217.    Defendants, with approval and ratification from the members of the enterprise, had full knowledge of or should have reasonably known of the true nature of the wrongful conduct of each other member of the enterprise, and aided and abetted such wrongful conduct, including acts of fraud, as alleged in this Complaint, and conspiracy, by providing substantial assistance and by encouraging the others to act.

218.    As a direct and proximate result of the aiding and abetting of these acts, Plaintiffs and Class Members have suffered injury, damage, loss and harm as described above.  The wrongful conduct aided and abetted by Defendants and the members of the enterprise was a substantial factor in causing this harm.

219.    Defendants and members of the enterprises' aiding and abetting of these wrongful acts was willful, malicious, oppressive, and in wanton and conscious disregard of Plaintiffs' and Class Members' rights.  Plaintiffs and Class Members are entitled to an award of punitive damages to punish their wrongful conduct and to deter future wrongful conduct.

220.    As a result, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

## Count XI
### (Declaratory and Injunctive Relief)

221.    Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

222.    Plaintiffs' RICO claims arise under 18 U.S.C. §1964(a), which authorizes the District Courts to enjoin violations of 18 U.S.C. § 1962, and under 28 U.S.C. § 2201, which authorizes associated declaratory relief.

223.    Defendants and members of the enterprise violated 18 U.S.C. §§ 1962(c) and (d) by engaging in a series of related predicate acts over a substantial period of time to effectuate their fraudulent scheme.  There remains a threat of continuing criminal activity, as the predicate acts or offenses alleged in this Complaint are part of Serra Nissan, Serra VW, Serra Automotive

Management and their employees and associates' regular way of doing business; not all members of the Serra Enterprise are known, and not all known members of the Serra Enterprise have been indicted.

224.    Moreover, Defendants and members of the enterprise continue to perpetrate their fraudulent scheme by employing investigators from A to Z Confidential Investigations, Inc. to contact Plaintiffs and Class Members to conceal or cover-up Serra Enterprise's fraudulent scheme by means of false and fraudulent pretenses, representations, promises, or omissions with the intent of preventing Plaintiffs and Class Members from seeking legal remedies.

225.    Enjoining Defendants from committing these RICO violations in the future and/or declaring their invalidity and enjoining Defendants from employing persons to contact Plaintiffs and Class Members to further perpetrate and conceal Defendants' RICO violations by means of false and fraudulent pretenses, representations, and promises is appropriate as Plaintiffs and Class Members have no adequate remedy at law and will suffer actual and imminent harm in the absence of the Court's declaratory and injunctive relief.

## CLASS ALLEGATIONS

226.    Plaintiffs adopt and incorporate all preceding paragraphs as if fully stated herein.

227.    Pursuant to Rules 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following Class:

> **All individuals in the United States who received an automobile loan processed by Serra Nissan.**

Excluded from the Class are the following individuals and/or entities:

a.    Any and all federal, state, or local governments, including but not limited to their department, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

b.    Individuals, if any, who timely opt out of this proceeding using the correct protocol for opting out;

c.      Individuals, if any, who have previously settled or compromised claims(s) as identified herein for the Class; and

d.      Any currently sitting federal judge and/or person within the third degree of consanguinity to any federal judge.

199.    This action should be certified as a class action because:

a.      Questions of law or fact are common to the Class and affect a large Class of individuals;

b.      Plaintiffs are members of the Class, and their claims are typical of the Class;

c.      The Class consists of a sufficiently large group of individuals, believed to exceed a thousand members, and is so large that it is impractical to join all members of the Class before the Court as individual plaintiffs.  The identity of Class Members is readily ascertainable through Defendants' own documents;

d.      Named Plaintiffs will fairly and adequately represent the claims of the Class, and protect the interests of the Class, without exercising personal interests or otherwise acting in a manner inconsistent with the best interests of the Class;

e.      Named Plaintiffs have retained attorneys experienced in class action litigation who will responsibly and vigorously advocate on behalf of the Class as a whole;

f.      Common questions of law or fact predominate over those questions affecting only individual members of the Class;

g.      A class action is superior to other methods of adjudication and specifically designed to result in the fair, uniform, and efficient adjudication of the underlying claims. This class action will facilitate judicial economy and preclude the undue financial, administrative, and procedural burdens that would necessarily result from a multiplicity of individual actions;

h.      Without Class certification, the prosecution of separate actions by individual Class Members would be impracticable and financially difficult, and create a risk of repetitive, inconsistent, and varying adjudications. This would have the effect of establishing

incompatible standards of conduct, discouraging the prosecution of meritorious but small claims, and/or result in adjudications that would be dispositive of the interests of other Class Members not parties to the adjudication, or otherwise substantially impair the ability of Class Members to protect their rights and interests; and

i. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making the award of damages, equitable relief, and/or restitution appropriate to the Class as a whole.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class, demand a trial by a struck jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully request that the Court enter judgment against Defendants and award relief as follows:

1. Compensatory damages, in amounts to be determined, which shall include loss of monies, incidental and consequential damages, severe mental anguish and emotional distress;

2. Three times the amount of Plaintiffs' and the Class' compensatory damages, in amounts to be determined, costs of the suit, expenses of litigation, and reasonable attorneys' fees, as provided in 18 U.S.C. § 1964(c);

3. Damages under the Alabama Consumer Identity Protection Act in an amount the Court deems appropriate to compensate Plaintiffs and Class Members for three times their actual damages, or $5,000.00, whichever is greater, as well as reasonable attorney's fees and costs;

4. Damages under the Alabama Deceptive Trade Practices Act, including any actual damages sustained by Plaintiff and Class Members, or the sum of $100, whichever is greater; three times actual damages; and attorneys'' fees and costs;

5. Punitive damages, in amounts to be determined;

6. Declaratory relief, injunctive, and/or other equitable relief as appropriate; and

7.     Such other and further relief, supplemental, alternative, different, or additional damages, pre- and post-judgment interest, costs, fees, or equitable relief as the Court deems proper.

Respectfully submitted,

Dated:  September 21, 2015          By: */s/ F. Jerome Tapley* _____
F. Jerome Tapley (ASB-0583-A56T)
Hirlye R. Lutz, III (ASB-6641-E59L)
Adam W. Pittman (ASB-0146-A33P)
W. Ryan Myers (ASB-1040-A16P)
**CORY WATSON, P.C.**
2131 Magnolia Avenue
Birmingham, Alabama 35205
Telephone:   (205) 328-2200
Facsimile:    (205) 324-7896
E-mail:        jtapley@corywatson.com
rlutz@corywatson.com
apittman@corywatson.com
rmyers@corywatson.com

**PLAINTIFFS WILL MOVE FOR SERVICE OF
SERRA AUTOMOTIVE MANAGEMENT, INC. BY CERTIFIED MAIL**